**Richard Kane GALE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 87–192.

Supreme Court of Wyoming.

May 2, 1990.

Rehearing Denied May 24, 1990.

Richard A. Hostetler, Denver, Colo., and Willis C. Geer, Gillette, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Bryne, David K. Gruver, Gerald P. Luckhaupt, Asst. Attys. Gen., for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

The primary questions presented in this case concern the rights of an accused in a sexual abuse case to compel a victim's psychological examination; to compel the state's furnishing summaries of expected expert witness testimony; to discover favorable evidence; and to obtain dismissal of the charges because of the state's failure to preserve evidence.

Appellant Richard Kane Gale, D.D.S. (Gale), appeals his jury trial convictions on three counts of taking immodest, immoral, or indecent liberties with a child in violation of W.S. 14-3-105 (June 1983 Repl.). Gale presents numerous issues premising error upon his inability to obtain various types of evidence for trial preparation; his issues include:

A. Whether the trial court erred in denying Dr. Gale's motion for psychiatric evaluation.

B. Whether the trial court erred when it denied Dr. Gale's motion for discovery of summaries of the substance of the expected trial testimony of the prosecution's expert witness.

C. Whether (sic) trial court erred in failing to order disclosure of the psychological and/or psychiatric records of the R children.

D. Whether the trial court erred in failing to disclose the social services files.

E. Whether the trial court erred in denying the motion (sic) disclosure of the tape recordings.

F. Whether the trial court erred in denying the motion for disclosure of school records.

G. Whether the trial court erred in denying the motion to dismiss or in the alternative suppress testimony of the R family.

H. Whether the trial court erred in denying the Motion to Dismiss or in the Alternative Suppress Testimony for failure to preserve evidence.

We affirm.

## FACTS

Gale was accused of entering the R family home on the evening of August 30, 1986 and sexually molesting three of the female R children in their rooms. A criminal complaint and warrant were issued on December 11, 1986. Gale was arrested the same day and charged with three counts of taking indecent liberties with a minor in violation of W.S. 14-3-105 (June 1983 Repl.). An information was filed on February 6, 1987.

Underlying this case is the bizarre atmosphere of sexual abuse and neglect that prevailed in the family home of GR and LR in 1986, and possibly before that time. In 1986, the R family included the parents GR and LR, five girls, ages three, three, seven, ten, seventeen, and a boy age eleven. On October 31, 1986, the Wyoming Division of Public Assistance and Social Services (D-PASS) received information that GR was sexually abusing the seven year-old child. The initial information led to a November 17, 1986, D-PASS interview of the seven year-old in which she indicated that GR had sexually abused her; in that interview, she also stated that her dentist had come into her bedroom one night and performed oral sex upon her. D-PASS used this information as the basis for two ongoing investigations into the conduct of GR and Gale, the family dentist, during the ensuing weeks. D-PASS conducted additional interviews and discussions with the ten year-old child, the seventeen year-old child, and LR, which

resulted in a criminal charge being filed against GR on October 28, 1986, alleging that he sexually assaulted the seven year-old child. GR received a preliminary hearing but was not bound over for trial.

At the same time the state was proceeding against GR on criminal charges, it also had a petition pending in juvenile court concerning the well-being of the R children. This record does not contain transcripts or recordings of any hearings which took place as a result of that juvenile petition. It does appear, however, that the R children were taken from GR and LR sometime in late 1986 and placed in foster homes. Gale also alleges that GR was under a court order not to have unsupervised contact with his children while the juvenile petition was pending and that, based on conversations which Gale's original defense counsel, a Terry Preuit, had with former Campbell County Prosecuting Attorney, Robert Rose, III, GR may have violated that order and been tried for contempt. These allegations are speculative, at least in terms of the information available in the record presented to this court.

The Campbell County Attorney decided not to reprosecute GR or bring charges against LR; instead, on January 16, 1987, LR entered into a "Juvenile Court Admission Agreement" in which the state agreed to grant her immunity from prosecution for child abuse or neglect in connection with the alleged acts committed by her husband. The stated purpose of this agreement was to allow LR "the opportunity to obtain help and to keep her family together if possible and further to facilitate the protection of the R children through the processes of the juvenile court." Under the agreement, LR admitted she had suspicions and actual knowledge that some of her children complained about sexual misconduct by GR and Gale. LR also agreed to interview with the state and truthfully relate her knowledge of contact between Gale and her children. She also agreed to testify truthfully about that subject if requested to do so by the state. The agreement obligated the state to grant immunity to both LR and GR concerning the incidents that allegedly oc-

curred in the R home and further stated that "[t]he state further warrants that it presently has no plans for alternative prosecution of [GR] in any other forum or for any other offense." The agreement also provided that "[t]his promise of immunity applies whether evidence of the crime or crimes comes from [LR] or any other source."

The parties to this appeal assert that a similar written agreement was reached between the state and GR. This agreement is said to have contained an admission by GR that he had repeated sexual contact with the seventeen year-old child, that he punished his son excessively, and that he endangered his family through alcoholism. The agreement, like LR's, is said to have granted GR immunity from prosecution on the charge that had been initially filed against him and further immunity from prosecution for any previous sexual misconduct or abuse he committed towards his children in the family home. In return, GR apparently agreed to interview and/or testify truthfully concerning his knowledge of Gale's alleged contact with the R children. This is supported in the record by testimony from the Campbell County prosecutor who made the decision not to refile the charge initially filed against GR in lieu of an agreement from GR that contained an admission of his past sexual misbehavior with his children and his promise to help the state prosecute Gale. The actual agreement between GR and the state, however, does not appear in the record on appeal. After these agreements were completed, the state pursued a case against Gale.

Gale had an extensive three-day preliminary hearing on January 30–31, 1987, and February 2, 1987. At this hearing, the state presented testimony from the three R daughters who implicated Gale. Gale's counsel was given an extensive opportunity to cross-examine them. Over 100 pages of the 600–page transcript from that hearing contain Gale's counsel's cross-examination of the eldest R daughter. The state also called LR and an expert witness, Dr. William Heinecke of Northern Wyoming Mental Health Center. Gale's counsel exam-

ined the male R child and a number of witnesses who gave testimony about the R children and the R family. Gale's counsel also examined the officer who compiled the police reports on GR and Gale. After listening to all of this testimony, the county court made a finding of probable cause and bound Gale over for trial.

On April 6, 1987, Gale filed numerous motions for discovery. Among these motions were: (1) a motion to compel three of the female children to undergo psychiatric evaluations to determine whether their mental condition could affect their credibility as prosecution witnesses; (2) an extensive general discovery motion which sought, among other things, summaries of the proposed testimony of prosecution expert witnesses; (3) a motion to compel disclosure of psychiatric records on three of the female children; (4) a motion for the disclosure of all Campbell County D–PASS records pertaining to the R family; (5) a motion for disclosure of any public or private school records on four of the R children; (6) and a motion for disclosure of any tape recording or transcript of any hearing regarding GR and LR's agreement with the state not to have contact with their children. Gale supported these motions with the affidavit of his own private investigator, which concluded that some of these records needed to be screened to gain an understanding of the dynamics of the R family and how those dynamics might play into the charges against Gale. He also attached police records, a written statement of the eldest R daughter, a written statement of one of the R children's friends, LR's juvenile court agreement, and other juvenile court documents. He filed requisite subpoenas duces tecum in support of these motions on April 22, 1987. Gale also filed motions to dismiss or suppress victim testimony because the state failed to preserve the initial interviews of the victims on audio or video tape; and to dismiss or suppress the testimony of the R family. D–PASS filed an objection and motion to quash in response to the subpoena duces tecum seeking D–PASS records on April 22, 1987. The state filed opposition to

Gale's motions to compel the child witnesses to undergo psychiatric examinations, for disclosure of tape recordings or transcripts of any juvenile court hearings, for disclosure of a summary of proposed testimony of prosecution expert witnesses, to dismiss for failure to preserve evidence, and to dismiss or suppress the testimony of the R family.

The trial court filed a decision letter on May 18, 1987, explaining its actions and findings concerning Gale's motions. Gale's motion for psychiatric examinations of the victims was denied based on the trial court's decision that the potential harassment of such examinations would not be justified by the information they might yield. The trial court similarly denied Gale's motion for summaries of proposed testimony from prosecution expert witnesses on the grounds that Gale had no right to such summaries under the Wyoming Rules of Criminal Procedure. Further, the trial court explained that it reviewed, *in camera*, the documents produced under Gale's subpoenas duces tecum for psychiatric records, D–PASS records, and school records. After completing this review, the trial court stated that it was applying the principles set forth in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), and found that none of the documents produced under the subpoenas duces tecum contained any information that was constitutionally material to Gale's case. The trial court did not review any of the psychiatric records requested by Gale's subpoena because none were produced; the trial court did agree to conduct an *in camera* review of such materials should any surface before trial. Gale's motion for tapes or transcripts of the juvenile court hearings was denied on the basis that those records were to remain confidential under Wyoming statute. Gale's motion to dismiss for failure to preserve evidence was denied based on the holding in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 n. 8 (1984). The trial court denied Gale's motion to dismiss or suppress the testimony of the R family, finding the agreement between the state and LR to have been legal and entered into after the

initial allegations against Gale were first made. A series of orders denying the motions as explained in the decision letter were filed on June 1, 1987.

A jury trial took place on May 18–21, 1987. The state presented evidence to support its theory that Gale had come into the R family home on the evening of August 30, 1986, and sexually molested three of the R daughters. Countering the defense's theory, the state argued that the trial testimony did not bear out the idea that the R family had conspired to place blame on Gale and away from GR. The state also called an expert witness who engaged in a general discussion of the characteristics one might expect to see in a sexual addict or professional abuser and the characteristics that might be manifested by a child sexual assault victim. Viewing the trial as a credibility contest between Gale and the R family, Gale's counsel argued that the testimony of LR and the R children was rehearsed and untrue and that they had psychologically "transferred" the sexual abuse their father had visited upon them to an unsuspecting Gale who was only a family friend. At trial, both Gale and his wife testified that Gale was at home during the evening of the alleged incidents, and did not visit the R home that night or the next day. Gale's counsel called its own expert witness, who answered questions about the testimony given by the state's expert witness, about Gale's scores on various personality tests, and about the effect abuse and neglect might have on a child's ability to recall specific events. The jury returned a guilty verdict on all three counts against Gale.

After a June 29, 1987, sentencing hearing, the court sentenced Gale to three terms in the state penitentiary of two to five years, those sentences to run concurrently. This appeal followed.

### I.

### Gale's Motion For Independent Psychological Examinations of the Minor Victims

Gale's first issue charges that the trial court somehow denied Gale a fair trial by

refusing to compel the minor victims to be examined by Gale's psychologist. Gale sought these examinations to provide his expert witness with a clinical basis for attacking the credibility and veracity of the R children as complainant witnesses and possibly to provide additional evidence to allow him to cross-examine the prosecution expert witness. We are uncertain as to how a trial court could actually compel a witness to undergo a psychological examination were one deemed to be appropriate, and these parties do not discuss that aspect of this issue. We also note that this issue does not involve any challenge to the competency of the complainant witnesses in this case. *Cf. Easterday v. State,* 254 Ind. 13, 256 N.E.2d 901, 905–06 (1970). Our discussion on this issue is limited to resolving Gale's assertion of a right to have these victims examined and is not intended to express any view on the potential problem of witness compliance or competency.

There is no specific legal authority allowing a defendant to compel a *witness* in a criminal trial to undergo an independent psychological examination at a defendant's request. In the civil arena, W.R.C.P. 35(a) provides for a mental examination of a *party* when the mental condition of that *party* is in issue in the case. Assuming an application of this rule to criminal cases, it does not confer authority to compel an examination of a victim who is a *witness* but not a party. *See State v. Liddell,* 211 Mont. 180, 685 P.2d 918, 924 (1984). Gale must also acquiesce to the legal proposition that he does not have a general state or federal constitutional right to conduct wide-ranging criminal discovery in the state's files. *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42 (1977) (citing *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82, 87 (1973)) (no federal due process right to general discovery in a criminal case); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218–19 (1963) (prosecution has an affirmative duty to turn over exculpatory material to the defense); and *Hubbard v. State,* 618 P.2d 553, 554–55 (Wyo.1980) (no state due process right to general discovery in a

criminal case). *See also* W.R.Cr.P. 18. These precedents leave Gale with the argument that a Wyoming trial court has inherent "due process" discretion to order a complainant witness to undergo a psychological examination by a defendant's psychologist and that failing to do so in this case amounted to an abuse of that inherent discretion.

■ To support his initial argument that this court should recognize an inherent trial court discretion to compel sexual assault victim/witnesses to submit to a psychological examination, Gale relies primarily on the California Supreme Court's holding in *Ballard v. Superior Court of San Diego County,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416 (1966), which has since been revisited and clarified by that court in *People v. Russel,* 69 Cal.2d 187, 70 Cal.Rptr. 210, 443 P.2d 794 (1968). In *Ballard,* the California court held that there may be sexual assault trials in which psychological expert testimony might be admissible to attack the credibility of uncorroborated testimony given by a complainant witness. *Ballard,* 49 Cal.Rptr. at 313, 410 P.2d at 849. Using this conclusion the California court held:

We therefore believe that the trial judge should be authorized to order the prosecutrix to submit to psychiatric examination if the circumstances indicate a necessity for an examination. *Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity.* Thus, in rejecting the polar extremes of an absolute requirement that the prosecutrix submit to a psychiatric examination, we have accepted a middle ground, placing the matter in the discretion of the trial judge.

*Id.* (emphasis added). *See also* O'Neale, *Court Ordered Psychiatric Examination of a Rape Victim in a Criminal Rape Prosecution—or How Many Times Must a Woman Be Raped?* 18 Santa Clara L.Rev. 119, 123–26 (1978). *Russel* echoed this reasoning and solidified the California court's

conclusion that a charge of sexual assault in which the complainant witness' testimony is uncorroborated might warrant using expert psychological or psychiatric testimony to challenge the credibility or veracity of that witness, thereby necessitating a compelled examination. The *Russel* court then went on to discuss the way in which trial court discretion should be exercised regarding the admission of expert testimony at trial for those purposes. *Russel*, 70 Cal.Rptr. at 216–17, 443 P.2d at 800–01.[1] *Cf. State ex rel. Holmes v. Lanford*, 764 S.W.2d 593, 594 (Tex.App.1989) (trial court does not have inherent authority to order independent psychological evaluation of four-year old sexual assault victim to challenge victim's competency), and numerous cases cited in Annotation, *Necessity or Permissibility of Mental Examination to Determine Competency or Credibility of Complainant In Sexual Offense Prosecution*, 45 A.L.R.4th 310 (1986).

■ We cannot adopt the *Ballard–Russel* rationale because doing so, under the facts of this case, would directly contradict recent case law from this court. *See Zabel v. State*, 765 P.2d 357 (Wyo. 1988). There, this court held unanimously that it is plain error in a sexual assault case for the trial court to allow an expert witness to comment directly on the credibility or veracity of a complainant witness. Determining credibility is the sole province of the jury, and we will not allow expert witness comment or testimony on the direct effect which an alleged emotional disturbance might have on a complainant witness' ability to tell the truth at trial. *Id.* at 362 (citing *Lessard v. State*, 719 P.2d 227, 233 (Wyo.1986)). *See also* W.R.E. 702; *People v. Visgar*, 120 Ill.App.3d 584, 75 Ill.Dec. 784, 791, 457 N.E.2d 1343, 1350

(1983); *State v. Walker*, 506 A.2d 1143, 1148 (Me.1986); *State v. Saldana*, 324 N.W.2d 227, 231 (Minn.1982); *People v. Souvenir*, 83 Misc.2d 1038, 373 N.Y.S.2d 824, 827 (1975).

Here, there is no doubt that Gale's primary purpose for seeking compelled psychological or psychiatric examinations of the minor victims was to form a foundation for expert psychological testimony on the effect the victims' emotional and psychological health might have on their ability to tell the truth. That is the continuous theme under which he has pursued his motion to compel psychiatric examination from the day he filed his initial motion through this appeal. This is illustrated in Gale's appellate brief on this issue, which expressly states:

> Dr. Gale filed a pre-trial motion seeking an order directing that [the three minor victims] submit to a psychiatric examination *for the purpose of determining whether their mental or emotional condition effected [sic] the credibility of their allegations against Dr. Gale.* The motion first argued that there was a significant question regarding the affect [sic] of the children's emotional and mental condition upon their *veracity* which was of such a nature as to establish a sufficiently compelling need for a psychological evaluation. Second, a psychological examination was essential to enable the defense to investigate, prepare to confront and cross-examine the prosecution expert witness.

(emphasis added). Obviously, this argument is fashioned exactly around the rationale used by the California Supreme Court in *Ballard* and *Russel*. Semantic arguments concerning the "way" the defense

---

1. The rationale used by the *Ballard* and *Russel* courts in the mid–1960's has been the subject of some strong criticism since it was established. The California legislature passed a statute in 1980 legislatively overriding the reasoning set forth in *Ballard*. See California Penal Code § 1112 (West 1985). A number of state appellate courts have openly refused to adopt the holdings in *Ballard* and *Russel* because they perceive the cases to be based upon the sexist assumption that the uncorroborated testimony of a sexual assault victim is necessarily less

believable and must be confirmed by psychiatric examination, or more simply stated, "most sexual assault victims must be crazy." *See, e.g., State v. R.W.*, 104 N.J. 14, 514 A.2d 1287, 1291 (1986); and *State v. Looney*, 294 N.C. 1, 240 S.E.2d 612, 622 (1978). The Wyoming legislature has specifically disavowed any requirement that a sexual assault victim's testimony must be corroborated for sufficient evidence to exist to sustain a sexual assault conviction. W.S. 6–4–312 (1977); *Heinrich v. State*, 638 P.2d 641, 646 (Wyo.1981).

might try to use this type of expert testimony at trial to attack the credibility of a victim/witness do not change this court's unanimous rejection of the use of expert testimony to invade the function of a jury. *Zabel,* 765 P.2d at 363. We do not imply that this type of evidence would not be admissible for other acceptable purposes, for example to explain some peculiar behavior of the victim to the jury. *See Griego v. State,* 761 P.2d 973 (Wyo.1988); *Lessard,* 719 P.2d at 233; *Scadden v. State,* 732 P.2d 1036, 1046 (Wyo.1987). That use of expert testimony, however, is not the basis for allowing compelled psychological examinations explained in *Ballard* and upon which Gale now relies. Since the *Ballard–Russel* rationale does not comport with the unanimous decision of this court in *Zabel,* we must reject it as a rule of law for Wyoming. Gale was not entitled to have the trial court order these minor victims to undergo psychological examinations to provide a foundation for his expert witness to challenge their credibility or veracity on the stand.

■ The only remaining reason Gale presents as justification for compelling psychological examinations is that he might have been able to use the results of such examinations to help him prepare for cross-examination of the state's expert witness. He cannot cite *Ballard, Russel,* or any cases that rely on those cases as authority for that proposition. Those cases are premised upon the idea that the examination provides the defense expert with a clinical basis to testify directly as to the credibility of the complainant witnesses. *Russel,* 70 Cal.Rptr. at 216–17, 443 P.2d at 800–01; *Ballard,* 49 Cal.Rptr. at 310–12, 410 P.2d at 846–48.

The other information and evidence available to Gale to prepare for cross-examination of the state's expert witness were substantial. That body of material included conferring with his own expert witness who testified at the trial concerning the results of numerous personality tests given to Gale, reviewing the pre–1984 D–PASS files and juvenile court records in his possession, reviewing the Gillette police records on the R family from 1980 through 1987 in his possession, tape recordings of

over three hours of interviews with the R children conducted by Gale's original defense counsel, timely notice of who the state's expert witnesses might be, and an unbridled opportunity to interview various persons who might be called as witnesses in the case. Gale had an opportunity to cross-examine the expert witness called by the state at the three-day preliminary hearing. At trial, the state called an expert witness, but the transcript shows that he was never asked to give a *direct clinical opinion* on the condition of the R children. After that testimony, Gale's counsel conducted an extensive cross-examination of the state expert witness. Considering the evidence available to Gale for the preparation of his defense, the trial court properly denied his request for psychiatric examinations of the R children on that basis.

## II.

*Gale's Motion for Summaries of Expected State Expert Witness Testimony*

■ Gale begins this argument by again admitting he has no general federal or state constitutional right to discovery in a criminal case and that no statute or rule of this court entitles him to discovery. We agree with his analysis to that point. *See Weatherford,* 429 U.S. at 559–60, 97 S.Ct. at 845–46, 51 L.Ed.2d at 42; *Hubbard,* 618 P.2d at 554–55. *See also* W.R.Cr.P. 18(c) (defendant has a right to the statement of a state witness *after* testimony is given). Instead, he relies on the idea that a trial court possesses some degree of inherent due process authority to grant a specific discovery request in a criminal case to insure fairness. Gale builds on this general conclusion by referencing American Bar Association Standards for Criminal Justice, by citing a federal case involving civil discovery, and by citing this court's holdings in *Gee v. State,* 662 P.2d 103, 104–05 (Wyo. 1983), and *Chapman v. State,* 638 P.2d 1280, 1284 (Wyo.1982) for the proposition that

when a prosecution utilizes scientific or quasi-scientific methods which may impact upon the assessment of credibility

at trial, it is important to insure that the defense has adequate pretrial opportunity to prepare to confront the evidence at trial. This may require pretrial discovery that goes beyond the generally applicable rules of procedure.

We do not necessarily disagree with Gale that the trial court does have a certain degree of due process discretion to grant exceptional criminal discovery requests to insure fairness. However, his assertion that under the facts of this case the trial court abused that type of discretion by denying him summaries of prospective testimony from state expert witnesses lacks authority. The American Bar Association Standards and the federal civil discovery case referenced by Gale are inapposite in this fact situation and of no consequence. As for *Gee* and *Chapman,* while those cases might stand for the above proposition when the case involves enhancing witness testimony through hypnosis, that specific application of due process does not automatically extend every discovery request by a criminal defendant beyond the bounds of W.R.Cr.P. 18.

The issue here is whether Gale received a fair trial. Under this issue Gale has to prove that by denying his motion for the summaries of potential state expert witness testimony, the trial court rendered this trial unfair and abused its discretion. In *Martin v. State,* 720 P.2d 894, 897 (Wyo. 1986), this court defined judicial discretion as "a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." Under this standard, Gale's challenge must be considered in light of evidence in the record indicating: (1) Gale was notified that the state would call certain expert witnesses at trial and that Gale has not alleged he was denied the opportunity to interview those individuals; (2) Gale was allowed to cross-examine extensively the state's expert witness at trial; and (3) Gale also offered substantial testimony of his own expert witness in rebuttal. Against this backdrop, we have difficulty understanding Gale's

claim that he was denied a fair trial in this regard or how the trial court abused its discretion when it denied Gale's motion to compel the production of summaries of the testimony potential state expert witnesses might give at trial. Applying the *Martin* definition of abuse of discretion, we conclude Gale has shown no abuse of discretion under this issue.

### III.

Gale's Motions to Obtain Psychiatric Records, D–PASS Records, School Records, and Juvenile Court Transcripts or Records

The trial court denied Gale's various discovery motions for disclosure of statutorily privileged information based on the holding in *Ritchie.* There, the United States Supreme Court granted certiorari to review the Pennsylvania Supreme Court's vacating of Ritchie's convictions for rape, involuntary deviate sexual intercourse, incest, and corruption of a minor, all charges that were brought on behalf of Ritchie's thirteen year-old daughter. *Id.,* 480 U.S. at 43, 107 S.Ct. at 994, 94 L.Ed.2d at 48. Before his trial, Ritchie served a Pennsylvania social service agency (CYS) with a subpoena seeking access to records concerning his daughter. CYS apparently acknowledged that the records existed but refused to produce them. There was no indication that the prosecution had access to or knowledge of the contents of the records at any time. *Id.,* 480 U.S. at 44, 107 S.Ct. at 995, 94 L.Ed.2d at 49 n. 4. Ritchie scheduled a sanctions hearing at which the trial court heard Ritchie's arguments that the records might contain the names of persons who might be favorable witnesses for him at trial. Ritchie also made a specific request for a medical report he believed to have been compiled by CYS in 1978. The trial court acknowledged not having reviewed the entire CYS file and accepted CYS' assertion that no 1978 medical report existed. It then denied Ritchie's motion for sanctions. *Id.,* 480 U.S. at 44, 107 S.Ct. at 995, 94 L.Ed.2d at 49 n. 3. At trial, the prosecution's main witness was Ritchie's

daughter and Ritchie was allowed to conduct an extensive cross-examination. The jury then convicted Ritchie on all counts, and he received a three to ten year prison sentence. *Id.*, 480 U.S. at 45, 107 S.Ct. at 995, 94 L.Ed.2d at 49.

In his appeal to the Pennsylvania Superior Court, an intermediate appellate court, Ritchie argued that his sixth amendment rights under the confrontation clause were violated when the trial court denied his motion for sanctions on CYS' refusal to honor the subpoena. That appellate court vacated Ritchie's conviction, holding that although Ritchie did not have an unlimited right to full disclosure of any statutorily privileged information in the CYS file, he did have a right to have the trial court conduct an *in camera* examination of any privileged records so that the victim's statements could be released. The full record was then to be released to Ritchie's lawyer so that he could use it to argue relevancy of those statements. Counsel for both the prosecution and the defense could then argue harmless error and relevancy, respectively, and the trial court could determine whether denying the information to Ritchie was prejudicial or not. *Id.*

On appeal to the Supreme Court of Pennsylvania, that court agreed to vacate Ritchie's conviction and remand, concluding that Ritchie's lawyer was entitled to search the entire record for useful evidence. The Pennsylvania Supreme Court relied on *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (criminal defendant had sixth amendment confrontation clause right to question witness concerning juvenile criminal record notwithstanding

state statute making such records inadmissible) to hold that denying Ritchie's lawyer access to the file denied him his sixth amendment right to confront his accusers because his counsel was not allowed to look at the entire file in an effort to locate evidence for the defense and because the trial court's review would not fulfill that end. *Ritchie*, 480 U.S. at 46, 107 S.Ct. at 995–96, 94 L.Ed.2d at 50.

On certiorari, the United States Supreme Court discussed the balance between the need to safeguard the privacy of privileged information and a criminal defendant's rights under the confrontation clause. It also reviewed that subject in the context of its holding in *Davis* and concluded that the Pennsylvania Supreme Court's interpretation of the holding in *Davis* was too broad. The Court explained that while its decision in *Davis* did protect a defendant's trial-right to substantive cross-examination of prosecution witnesses, it did not "transform the confrontation clause into a constitutionally-compelled rule of pre-trial discovery." *Ritchie*, 480 U.S. at 52, 107 S.Ct. at 999, 94 L.Ed.2d at 54. On that basis, a plurality of the Court held that Ritchie's confrontation clause right to cross-examine the prosecutrix had been preserved by the trial court's actions. *Id.*, 480 U.S. at 53, 107 S.Ct. at 1000, 94 L.Ed.2d at 54.

Next, the Court discussed the implications which the trial court's actions might have in terms of the sixth amendment compulsory process clause and eventually opted to address Ritchie's claim within the context of more carefully defined due process precedents concerning fundamental fairness in criminal trials.[2] The opinion first emphasized that under the sixth

---

**2.** In *Ritchie* the Court stated:

This Court has never squarely held that the Compulsory Process Clause guarantees the right to discover the *identity* of a witness, or to require the Government to produce exculpatory evidence. Instead the Court traditionally has evaluated claims such as those raised by Ritchie under the broader protections of the Due Process Clause of the Fourteenth Amendment. Because the applicability of the Sixth Amendment to this type of case is unsettled, and because our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for

review, we adopt a due process analysis for purposes of this case. Although we conclude that compulsory process provides no *greater* protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment. It is enough to conclude that on these facts, Ritchie's claims more properly are considered by reference to due process.

*Ritchie*, 480 U.S. at 56, 107 S.Ct. at 1001, 94 L.Ed.2d at 56–57. (citations omitted).

amendment due process clause the "government has the obligation to turn over [to the defense] evidence in its possession that is both favorable to the accused and *material* to guilt or punishment." *Id.*, 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57. (emphasis added) (citing *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218). The Court also acknowledged the qualified statutory policy of the Commonwealth of Pennsylvania in keeping this type of information confidential unless its release was compelled by court order. *Ritchie*, 408 U.S. at 57, 107 S.Ct. at 1002, 94 L.Ed.2d at 56.[3] Next, the Court recognized that under the applicable Pennsylvania statute, and in certain circumstances, such records might contain *constitutionally material* information vital to the defense. The Court then drew upon the standard for constitutional materiality it had previously articulated in *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985)[4], and stated:

It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland, supra*, [373 U.S.] at 87, 83 S.Ct. at 1194. Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley, supra*, 473 U.S. at 682, 105 S.Ct. at 3375 (opinion of BLACKMUN, J.); *see id.*, at 685, 105 S.Ct. at 3375, 87 L.Ed.2d at 481 (opinion of WHITE, J.).

*Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001–02, 94 L.Ed.2d at 57. *Cf. Aguilar v. State*, 764 P.2d 684, 688–89 (Wyo.1988); W.R. Cr.P. 49(a); W.R.A.P. 7.04 (harmless error standard in Wyoming). Using this standard, the Court affirmed the decision of the

---

**3.** Note the Court's statement in footnote 14 that it was not expressing any opinion concerning the balance it might strike when the state statute creating the privilege would not allow for a court ordered disclosure. *Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1002, 94 L.Ed.2d at 56 n. 14. This is a significant factual distinction which has created different results when the statute involved creates an "absolute" privilege. *Cf. People v. Foggy*, 121 Ill.2d 337, 118 Ill.Dec. 18, 22, 521 N.E.2d 86, 90 (1988); *Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120, 129 (1987).

**4.** In *Bagley*, the Court discussed three scenarios that can exist when the prosecution's obligations under *Brady* come into play. It then articulated the constitutional standard of materiality to be applied in those three situations. The Court explained that the defendant might not make any request for *Brady* material, or that the defendant might make a "general" or a "specific" request for material it believed to be in the prosecution's possession. After explaining these three situations the Court stated:

The Court has relied on and reformulated the *Agurs* standard for the materiality of undisclosed evidence in two subsequent cases arising outside the *Brady* context. In neither case did the Court's discussion of the *Agurs* standard distinguish among the three situations described in *Agurs*. In *United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102

S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982), the Court held that due process is violated when testimony is made unavailable to the defense by Government deportation of witnesses "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." And in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2052, 80 L.Ed.2d 674. The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine the confidence in the outcome." *Ibid.*

We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused: *The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.*

*Id.*, 473 U.S. at 681–82, 105 S.Ct. at 3383, 87 L.Ed.2d at 493–94. (emphasis added).

Pennsylvania Supreme Court to remand the case for further proceedings and held that:

Ritchie is entitled to have the CYS file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial. If it does, he must be given a new trial. *If the records maintained by CYS contain no such information or if nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction.*

*Ritchie,* 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58.

The remaining task facing the Court was to apply the constitutional materiality standard it had just adopted in a way that guaranteed a defendant's rights to a fair trial without radically altering traditional constitutional limits on criminal discovery. The Court began this discussion by noting that a defendant has never had a general constitutional right to conduct his own unsupervised search in the state's files to argue relevancy. *Id.,* 480 U.S. at 59, 107 S.Ct. at 1003, 94 L.Ed.2d at 58 (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; and *Weatherford,* 429 U.S. at 559, 97 S.Ct. at 846, 51 L.Ed.2d at 42. *Cf. Hubbard,* 618 P.2d at 554–55. The Court also described that in a typical case settled practice was for the defendant to make a general request to the prosecution for exculpatory evidence and then the state would decide what information must be disclosed. *Ritchie,* 480 U.S. at 59, 107 S.Ct. at 1003, 94 L.Ed.2d at 58–59 (citing *Brady* ). Considering these things in conjunction with the requirements of due process, the Court struck the necessary compromise by holding that a defendant would not be allowed to have his attorney look through the privileged records, but defense counsel would be allowed to have the trial court conduct an *in camera* review for information constitutionally material to the defense. The Court characterized this as a balance between the competing interests and reiterated that a trial court's duty to disclose such information was ongoing, requiring the trial court to release privileged information whenever it becomes constitutionally material to the proceedings. *Id.*

■ This *in camera* review for constitutionally material evidence was the standard under which the trial court addressed Gale's subpoenas for various records in which the state asserted a privilege. The trial court conducted this review focusing on privileged materials at issue, on the defendant's ability to gather such evidence from other sources, and on how the privileged evidence may relate to the defendant's theory of the case. This approach is consistent with *Ritchie;* we adopt it for Wyoming and will employ it to review the trial court's actions in this case. *See State v. Cusik,* 219 N.J.Super. 452, 530 A.2d 806, 813 (1987).

A. Psychiatric Records

■ Gale begins his argument for disclosure of psychiatric records by asserting he has a right to examine any records of psychological counseling or treatment experienced by the R children. The state responds that before we can address the propriety of Gale's argument we must determine if the record contains any evidence of these documents such that this issue is properly preserved for appeal. This requires us to review the record concerning Gale's requests for such information.

Two of Gale's requests for pretrial discovery concerned speculation by his counsel that some records of psychological counseling or treatment of the R children existed which might lead to the discovery of exculpatory evidence or witnesses for the defense. Gale's counsel filed a motion to compel the state to produce psychological records on April 6, 1987, and similarly had a subpoena duces tecum issued to Dr. Heinecke of Northern Wyoming Mental Health Center on April 24, 1987. The trial court held a motions hearing on the same day during which Gale's attorney admitted his request for psychological records was speculative. Gale's counsel was also given an opportunity to cross-examine Heinecke at this motions hearing but did not question him about the existence of any psychiatric records concerning the R children.

There was minimal evidence that Heinecke took some notes during his treatment of the R children, but Gale's counsel did not pursue that point in the motions hearing or in subsequent pleadings.

At the motions hearing, the trial court addressed the subpoena duces tecum issued to Heinecke and concluded that because any examinations or treatment Heinecke might have conducted with the R children were pursuant to the earlier juvenile court proceedings, their availability to the defense would be decided under Gale's motion for release of the juvenile court records. The issue is discussed in this appeal below. In its decision letter on the issues raised in Gale's motions hearing, the trial court stated:

> In discussing the disclosure of psychiatric records sought by the defendant's motion, there has not been shown to exist any such psychiatric examinations or records to this Court up to this time [May 15, 1987]. I will simply repeat what I have said earlier, that under the due process clause this court recognizes that the State has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment, but there is no general constitutional right to discovery in a criminal case and the *Brady* case did not create one. *Pennsylvania v. Ritchie, supra.* In any event, *should it be brought to the Court's attention that there are psychiatric records of the minor complainants in this case, the court will consider them in camera as it has the other confidential information sought by defendant to determine their materiality.*

(emphasis added.)

Gale has never put forth any additional evidence showing that such records exist, let alone establish some basis for a claim that such records might contain information constitutionally material to his defense. *See Ritchie,* 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58 n. 15. Further, Gale has the burden to provide us with a record supporting further review of this issue. *Edwards v. Edwards,* 732 P.2d 1068, 1070 (Wyo.1987) (citing *Nicholls v. Nicholls,* 721 P.2d 1103, 1105 (Wyo.1986); and *State v. Dieringer,* 708 P.2d 1, 12 (Wyo.1985)). The district court did all that it could do. It gave Gale an open invitation to present evidence establishing the existence of psychological records not a part of the juvenile court file and information within such records that might be constitutionally material to his defense. Gale never took advantage of the district court's offer; consequently, he has not fulfilled his burden to present this court with a record that would afford him appellate review on this issue.

## B. D–PASS Files

Gale moved for disclosure of all D–PASS files involving the R family. His motivation for that disclosure was that D–PASS caseworker notes of interviews with R family members might contain references to the allegations against him that could be useful in constructing his defense. Pursuant to the analysis set out in *Ritchie* the trial court reviewed the D–PASS records *in camera.* After this review it sealed the D–PASS records and made them a part of the record now before us on appeal. Based on its review of these records the trial court found no material or relevant evidence concerning the charges against Gale and denied his request that they be disclosed to him.

D–PASS records are statutorily privileged materials under W.S. 14–3–214 (July 1986 Repl.), which provides in pertinent part:

> (a) All records concerning reports and investigations of child abuse or neglect are confidential except as provided by W.S. 14–3–201 through 14–3–215.
>
> (b) Applications for access to records concerning child abuse or neglect contained in the state agency or local child protective agency shall be made in the manner and form prescribed by the state agency. Upon appropriate application, the state agency shall give access to any of the following persons or agencies for purposes directly related with the admin-

istration of W.S. 14–3–201 through 14–23–215:

> (i) A local child protective agency;

> (ii) A law enforcement agency, guardian ad litem, child protection team or the attorney representing the subject of the report;

> (iii) A physician or surgeon who is treating an abused or neglected child, the child's family or a child he reasonably suspects may have been abused or neglected;

> (iv) A person legally authorized to place a child in protective temporary custody when information in the report or record is required to determine whether to place the child in protective custody;

> (v) A person responsible for the welfare of the child;

> (vi) *A court or grand jury upon a showing that access to the records is necessary for the determination of an issue, in which case access shall be limited to in camera inspection unless the court finds public disclosure is necessary;* and

> (vii) Court personnel who are investigating reported incidents of child abuse or neglect.

(emphasis added). The D–PASS records in question are only those files created after sometime in 1984. A predecessor Campbell County attorney had earlier provided Gale's counsel with pre–1984 D–PASS files. The record does not explain why those privileged files were prematurely released.

Gale challenges the trial court's actions under this issue in essentially two ways: (1) he argues that nondisclosure of the post–1984 D–PASS records denied him his constitutional rights to a fair trial under the due process guarantee, as well as effective assistance of counsel, right to confrontation, and compulsory process;[5] and (2) he argues that the trial court erred when it applied the constitutional materiality standard for reviewing the privileged records set out in *Ritchie.*

We have already decided Gale's general constitutional challenges by adopting the United States Supreme Court's reasoning in *Ritchie.* His right to confrontation was satisfied when he was allowed to conduct extensive cross-examination of the prosecution witnesses against him. *Ritchie,* 480 U.S. at 52–53, 107 S.Ct. at 999–1000, 94 L.Ed.2d at 54–55 (explaining *Davis,* 415 U.S. at 318–20, 94 S.Ct. at 1110–12, 39 L.Ed.2d at 354–56). *See also Story v. State,* 721 P.2d 1020, 1034 (Wyo.1986) (this court's recognition and explanation of the holding in *Davis* ). Like the United States Supreme Court, we will address his challenge concerning the compulsory process clause under our overall analysis of the fairness of this trial as a matter of due process. *Ritchie,* 480 U.S. at 56, 107 S.Ct. at 1001, 94 L.Ed.2d at 57. Gale's assertion that the trial court somehow denied him effective assistance of counsel by refusing to disclose all of the D–PASS records is make-weight. Gale's counsel did all that he could do when he moved for disclosure of the records and argued for their disclosure at the motions hearing. The trial court denied those disclosure requests based on controlling United States Supreme Court precedent. The only general constitutional issue presented is whether, in doing so, the trial court compromised Gale's due process right to a fair trial when it applied the holding from *Ritchie.* Hence, our discussion of the trial court's application of *Ritchie* is dispositive for both of Gale's challenges under this issue.

Gale argues that the *in camera* procedure mandated by the holding in *Ritchie* should not have been applied to his request for D–PASS files because the language of W.S. 14–3–214(b)(iii), set out above, provides for release of such files to law enforcement agencies under certain specific circumstances. Gale also claims the record shows that D–PASS employees actively aided law enforcement personnel in investigating the case against him. He then combines these points, concluding that because information in the D–PASS files was "directly available" to the state it should have

---

5. *See* U.S. Const. amend. VI and XIV; and Wyo. Const. art. 1, §§ 6 and 10.

been deemed to be in its possession. That presumption, he urges, should be the basis for releasing the D–PASS files to Gale's counsel to insure fundamental fairness and due process.

We agree with the state that Gale's novel reasoning rests precariously upon several of his own assumptions, which do not find support in this record. He first assumes that the state must have had the post–1984 D–PASS records in its files because D–PASS was obligated by statute to investigate the charges at issue. *See* W.S. 14–3–204. Whether those interviews were reported or not, the record does not indicate that the state obtained copies of them for use in constructing a case against Gale. Gale has pointed to no record evidence indicating that the state actually had those reports. Further, the statute specifically provides that a law enforcement agency wishing to obtain D–PASS records in this situation must apply for them and obtain them pursuant to agency disclosure rules. The record does not contain any evidence of such an application by the prosecution in this case.

Gale's argument also seems to be premised on an assumption that, because he did not receive any post–1984 D–PASS files from the county attorney, the prosecution in this case must have decided not to comply with its *Brady* obligation to disclose to the defense any exculpatory material it actually *possessed. Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57. *See also Wilde v. State*, 706 P.2d 251, 255 (Wyo.1985). We decline to make that assumption, lacking some evidence in the record to the contrary. The determination of whether evidentiary items are subject to disclosure under *Brady* belongs to the prosecution. *Weatherford*, 429 U.S. at 560, 97 S.Ct. at 845, 51 L.Ed.2d at 42; *Hubbard*, 618 P.2d at 554–55. If the defense has a basis for requesting evidence it believes the prosecution has, but is not divulging, then application for disclosure of that evidence can be made to the prosecution and, if necessary, to the trial court. *United States v. Agurs*, 427 U.S. 97, 106–07, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342, 351 (1976); *Jones v. State*, 568 P.2d 837,

848 (Wyo.1977). This record shows that the prosecution had a thorough understanding of its obligations under *Brady* and repeatedly acknowledged them in open court and in its pleadings.

Gale's argument that the *Ritchie* standard for constitutional materiality should not be applied under this issue also lacks merit. He claims applying that standard is unfair because it is an appellate standard that "is necessarily backward looking and therefore is framed in terms of whether the evidence would change the result." This argument ignores the parallel that exists between the prosecution's obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment and the trial court's obligation to review privileged information for evidence that might be constitutionally material to the defendant's case. *Ritchie*, 480 U.S. at 56, 107 S.Ct. at 1001, 94 L.Ed.2d at 56–57 (citing *Bagley*, 473 U.S. at 672, 105 S.Ct. at 3378, 87 L.Ed.2d at 487; *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354; and *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218); *see also Wilde*, 706 P.2d at 255. Gale cites no authority supporting his criticism of the constitutional materiality standard as being devised to be used only in hindsight. *Cf. Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494–95. Rather, like the standard applied to the prosecution in *Brady*, it appears to have been intended to focus the trial court's attention on an *in camera* search for privileged information that could change the outcome of a defendant's trial. Gale seems eager to apply this type of standard to the prosecution once he assumes they have not met their obligations under *Brady*, but he does not want the trial court to apply it to him when it reviews privileged information he speculates might be pivotal in his defense. He cannot have it both ways.

The *Ritchie* materiality standard provides a workable balance between the state's interest in the confidentiality of certain information and a defendant's potential need for such information in some situations, and it controls in this situation.

*Ritchie*, 480 U.S. at 60–61, 107 S.Ct. at 1003–04, 94 L.Ed.2d at 59–60, cited in *Cusik*, 219 N.J.Super. 452, 530 A.2d 806, 813 (1987). *See also People v. Reber*, 177 Cal. App.3d 523, 223 Cal.Rptr. 139, 147 (1986). We also note that Gale had in his possession copies of a fairly extensive set of pre–1984 D–PASS reports along with Gillette police department reports on the R family for 1986 and 1987 and had ample opportunity at trial to focus the jury's attention on the social problems that were a day-to-day reality in the R family home from at least 1980 forward. Applying the *Ritchie* standard, and after our own review of the D–PASS records and considering the evidence that was available to Gale before trial, we agree with the trial court that the D–PASS records contain no evidence that is or was constitutionally material to the outcome of this case. That conclusion requires us to affirm on this issue.

## C. School Records

■ Our review of the trial court's decision not to disclose the school records parallels the analysis we used to review its decision on the D–PASS records. The school records of the R children are statutorily privileged under W.S. 16–4–203(d)(viii) (Cum.Supp.1987): [6]

> (d) The custodian shall deny the right of inspection of the following records, unless otherwise provided by law:
>
> > (viii) School district records containing information relating to the biography, family, physiology, religion, academic achievement and physical or mental ability of the person except to the person in interest or to the officials duly elected and appointed to supervise him.

*See also* 20 U.S.C. § 1232g(b) (1982) (school records in schools receiving federal funding are confidential but may be released pursuant to court order).

Gale requested disclosure of the school records based on the theory that grade fluctuations and attendance records might be relevant to the relationship between the R children and their father. The school records were produced at the motions hear-

ing pursuant to Gale's subpoenas duces tecum to the various schools the R children had attended. The trial court reviewed them *in camera*, the same way it reviewed the D–PASS records, and concluded that there was no information in the school records that was constitutionally material to Gale's defense.

Gale makes the same legal arguments for disclosure of the school records that he made above concerning the D–PASS files. As before, he has made no showing that the prosecution ever actually possessed these records. On the other hand, Gale has made no complaint that he was hindered in his ability to learn more about the R family by having his investigator interview people in the community who knew the R children and their parents. Considering all of these circumstances, we again apply the constitutionally material standard from *Ritchie* in review of the trial court's ruling against disclosure of the school records. That review reveals no evidence that is or was constitutionally material to Gale's defense. *See Reber*, 223 Cal.Rptr. at 147; and *Cusik*, 530 A.2d at 813. Therefore, we affirm the trial court's conclusion that they did not contain evidence material to Gale's defense.

## D. Juvenile Court Transcripts, Recordings, or Records

■ In this issue, Gale premises error upon his inability to obtain transcripts or recordings of any juvenile court hearings concerning GR's contact with the R children once he had been accused of abusing and sexually molesting them. Gale wanted to review this information, if it existed, to gather more evidence in support of his theory that GR intimidated or coerced LR and the R children into implicating Gale to shift blame from himself. Gale has never put forth evidence actually establishing the existence of such transcripts or recordings or showing that the prosecution used them in this case. Rather, his basis for believing that such records exist, and are material to his defense, centers around hearsay statements made by his original defense coun-

**6.** Codified as amended at W.S. 16–4–203 (Cum. Supp.1988).

sel, Terry Preuit, that former Campbell County Attorney, Robert Rose, had at least considered trying to hold GR in contempt of court for having unsupervised visits with the R children in violation of a juvenile court order allowing only supervised visits.

Gale filed his motion for disclosure of any juvenile court transcripts or records on April 6, 1987. Attached to that motion were a number of exhibits including a copy of the November 18, 1986 juvenile petition filed on behalf of the R children, LR's January 16, 1987 juvenile court agreement, a number of police files which chronicled investigations of the R family and the R children from mid–1980 through December 1986, and statements of several of the R children and their friends. It is not clear how Gale obtained these records.

At the April 24, 1987 motions hearing, Gale called Rose as a witness and examined him during a telephone conference call. Gale's counsel questioned Rose at length about the events leading up to GR and LR's juvenile court agreements. Curiously, he did not ask Rose about any attempt or consideration to seek a contempt citation against GR for violating the alleged juvenile court order prohibiting unsupervised visitation or for any violations of the juvenile court agreement GR is said to have signed. Gale did not call his former defense counsel, Preuit, or any other witnesses to bolster his suspicion that transcripts, recordings, or records of such a hearing actually existed.

The trial court denied Gale's motion for disclosure of any Juvenile Court transcripts or records, noting that the holding in *Davis* did not provide Gale with carte blanche authority to examine privileged juvenile court records in a search for information helpful to his case. *See also Ritchie*, 480 U.S. at 59, 107 S.Ct. at 1003, 94 L.Ed.2d at 58–59 (citing *Bagley*, 473 U.S. at 675–76, 105 S.Ct. at 3379–80, 87 L.Ed.2d at 489–90; and *Weatherford*, 429 U.S. at 559, 97 S.Ct. at 846, 51 L.Ed.2d 30. *Cf. Hubbard*, 618 P.2d at 554–55). The trial court did not explain whether the prosecution was ever shown to have possessed the alleged juve-

nile court transcripts, recordings, or records and did not say whether it had reviewed any such information *in camera.*

This issue is similar to the issue above dealing with independent psychological records in that even the sealed portion of the record before this court does not contain the information that Gale wanted disclosed. Consequently, we are left with a few scraps of testimony from Rose's deposition to try and determine whether these records did exist, whether the state ever possessed them for use in this trial, and if so, whether the trial court unfairly denied Gale access to them.

When Gale filed his motion for disclosure, he had an obligation to the trial court to establish a basis for his claim that the privileged information he sought contained evidence constitutionally material to his defense. *Ritchie*, 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58 n. 15. We also reiterate that Gale, as appellant, has the obligation to provide this court with enough record evidence to allow review of this issue. *Edwards*, 732 P.2d at 1070 (citing *Nicholls*, 721 P.2d at 1105; and *Dieringer*, 708 P.2d at 12). Gale has not only failed to establish a basis that any juvenile court transcripts, recordings, or records contain evidence constitutionally material to his defense, he has not put forth minimal evidence establishing that such records exist.

We hold that the appellate record is insufficient to support Gale's challenge concerning any alleged juvenile court transcripts, recordings, or records.

## IV.

### Gale's Motion to Dismiss or Suppress Testimony of the R Family

 Gale presents two arguments under this issue. First, he challenges the effect which the GR and LR's juvenile court agreements had on the testimony of the entire R family as violative of his rights to due process. Second, he challenges the substance of the agreements between GR and LR and the state as viola-

tive of his rights to due process. We address Gale's sub-issues in reverse order.

In his challenge to the substance of the juvenile court agreements, Gale identifies the appropriate standard of due process review as set out in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1961). In *Rochin,* the Court held that the prosecution violated federal due process when it obtained evidence by "conduct that shocks the conscience." *Id.,* 342 U.S. at 172, 72 S.Ct. at 209, 96 L.Ed. at 190. *See also Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Gale also refers us to federal case law discussing the propriety of prosecutorial agreements to obtain evidence. *See, e.g., United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984); *Williamson v. United States,* 311 F.2d 441 (5th Cir.1962); *United States v. Baresh,* 595 F.Supp. 1132 (S.D.Texas 1984). As observed by the trial judge in his decision letter, these cases all involve contingency arrangements in which the prosecution *conditions* its offer to seek sentence reduction or immunity for the defendant upon the defendant's ability to produce evidence leading to the arrest or indictment of another specific individual in criminal activity. *Waterman,* 732 F.2d at 1529 n. 1, 1530; *Williamson,* 311 F.2d at 442–45 (illegal contingent fee agreement); *Baresh,* 595 F.Supp. at 1134.

These arguments and citations do not apply to the specific facts of this case. The agreement between LR and the state is not a contingency agreement. That is, it does not condition the grant of immunity given to LR, and apparently to GR, upon their ability to produce evidence that resulted in the arrest, indictment, or conviction of Gale. LR's agreement specifically recited that she would receive immunity from prosecution so long as she testified truthfully concerning her knowledge of Gale's involvement with her children; in terms of her testimony, this is nothing more than her affirmance of the obligation she would be under if the state subpoenaed her as a trial witness. The record is unclear on the exact terms of GR's juvenile court agreement, but Gale admits it did not contain any contingency provisions. This type of

agreement between the prosecution and the parents of admittedly abused children is not one that shocks the conscience of this court. Gale fails to cite any precedent for the idea that this type of agreement is somehow per se illegal; and he also fails to refute or distinguish more recent federal case law upholding prosecutorial contingent arrangements and suggesting that the jury, not an appellate court, should determine the credibility of witnesses who are party to prosecution agreements. *See United States v. Cervantes–Pacheco,* 826 F.2d 310, 312–16 (5th Cir.1987) and cases cited therein.

Gale's challenge to the overall effect of the juvenile court agreements as violative of his rights to due process is couched in his argument that this court should invoke an "inherent supervisory power to ensure fair conduct from the prosecution in furnishing evidence to the courts." Since we held above that the agreements themselves were not violative of due process it is hard to understand how Gale's speculation as to their effect leads to the conclusion that their existence alone denied him due process. While Gale has set out his *theories* of how the juvenile court agreements were incentive for R family members to lie, he offers no record evidence in support of those theories or any assertion that his extensive opportunity at trial to cross-examine those witnesses on credibility was undermined. Bald assertions do not take the place of record evidence from which real inferences can be drawn. *Cf. Greenwood v. Wierdsma,* 741 P.2d 1079, 1086 (Wyo.1987) (conclusory affidavits in summary judgment proceedings have little or no effect). This court will not substitute itself for the jury simply because Gale wanted certain witnesses to testify in another way; his argument on this issue lacks merit. *Newton v. State,* 698 P.2d 1149, 1151 (Wyo.1985).

## V.

### Gale's Motion to Dismiss for Failure to Preserve Evidence

 This issue involves Gale's assertion that the initial police interviews with the

victims must have contained information that would potentially aid him in his defense. Gale does not argue that he was denied access to the interviewer's notes or that the trial court denied him the right to cross-examine any of the state's witnesses whose testimony could be traced to the initial victim interviews; he also forgoes any suggestion that the police or the state acted in bad faith concerning the content of the interviews. Instead, Gale argues that the lack of such recordings somehow deprived him of his best opportunity to judge what the victim's precise allegations and explanations for their allegations were when they were first uttered. Gale says this deprivation violates the holding in *Trombetta*, which he asserts stands for the legal proposition that the police have an affirmative constitutional duty to gather and preserve evidence, as well as the recognized duty to disclose exculpatory evidence. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

We disagree with Gale's interpretation of the law on this issue. This court held that the state does not have a constitutional duty to manufacture evidence in addition to its duty under *Brady* to disclose exculpatory evidence in its possession. We also specifically held that a deputy's apparent negligence in not properly tape recording a conversation between the defendant and the deputy did not violate the defendant's rights to due process of law. *Wilde*, 706 P.2d at 255 (citing *Trombetta*, 467 U.S. at 488–91, 104 S.Ct. at 2529–30, 81 L.Ed.2d at 421–24). Here, the trial court's ruling paralleled our conclusions in *Wilde*.

■ Gale's assertion would expose the state to the risk of automatic dismissal for failure to tape record every initial interview it conducts with a minor victim alleging sexual assault. The state has a duty to preserve evidence only if the disputed evidence is shown to have been constitutionally material because it possessed known exculpatory value and if the defendant could not obtain comparable evidence using other reasonable means. *Wilde*, 706 P.2d at 255 (citing *Trombetta*, 467 U.S. at 479–80, 104 S.Ct. at 2529, 81 L.Ed.2d at 416–17). *Wilde*

and *Trombetta* plainly limit the state's duties to preserve and disclose evidence to those duties explained in *Brady*.

We also note the United States Supreme Court's recent opinion in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood*, the defendant was charged with kidnapping and sexually assaulting a minor. When the victim reported the crime, a physician used a "sexual assault kit" to take samples from the victim that might later be used as evidence at trial. The police took these samples and the victim's clothing, but they did not refrigerate the clothing. Later, when the state criminologist tried to compare samples from the kit with stains he found on the clothing, the failure to refrigerate the clothing made the comparison impossible. Evidence from such a comparison could have exonerated the defendant who was convicted. The state appellate court reversed the conviction focusing on the potential which the lost evidence had for exoneration and the Court granted the state's petition for certiorari. In its opinion, the Court discussed the constitutional standards for the obligation the police have to preserve evidence and then held that "unless a criminal defendant can show bad faith on the part of the police, [negligent] failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at ——, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

Gale had access to the interviewer's notes and an extensive opportunity to cross-examine the interviewer and the victims; he has never alleged police bad faith. Due process was satisfied in this regard.

Affirmed on all issues.

THOMAS, J., files a specially concurring opinion in which CARDINE, C.J., joins.

URBIGKIT, J., files a dissenting opinion.

THOMAS, Justice, concurring specially, with whom CARDINE, Chief Justice, joins.

I agree with the decision of this case according to the majority opinion. I am

content with all aspects of its holdings, and the rationale for those holdings, except for part "I. Gale's Motion For Independent Psychological Examinations of the Minor Victims." The final dispositive statement of that issue as provided in the majority opinion ("The trial court acted properly and within its discretion when it denied Gale's motion to compel the examinations.") suggests by implication that the trial court could have granted that motion as a matter of discretion. It is only in attaching that significance to the majority opinion that I find myself in agreement with the dissent. That implication is contrary to the specific rejection of the California theory articulated in *Ballard v. Superior Court,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416 (1966), and *People v. Russel,* 69 Cal.2d 187, 70 Cal.Rptr. 210, 443 P.2d 794, cert. denied 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968). It is also inconsistent with our ruling in *Zabel v. State,* 765 P.2d 357 (Wyo.1988). I can only conclude that the majority opinion *inadvertently* indicated that the trial court might be vested with discretion to order a psychiatric or psychological evaluation of a victim witness.

I have no quarrel with the criticism of the *Ballard* and *Russel* rationale found in the opinions of other jurisdictions. I add my own. It is certain that no court can require any person to submit to a psychological or psychiatric examination or evaluation. Without the cooperation of the subject, no meaningful conclusions can be drawn nor can an appropriate diagnosis be made. A court could, however, order submission to the procedure under penalty of contempt of court. I unequivocally believe that even our enlightened society would not long tolerate a result that found the victim incarcerated for refusing to submit to an evaluation or examination while the accused perpetrator suffered no consequences. The only other alternative would be a dismissal of the state's charges if the victim witness would not cooperate in the procedure. Again, I am firm in my conviction that the people would find that approach too ludicrous to bear. Consequently, because the possible remedies are ineffi-cacious, there is no point in affording any discretion to the trial courts in this regard, and this court should say clearly that no such discretion is recognized in the law.

I perceive the dissenting opinion as essentially a call for reform of the rules of discovery that pertain in a criminal case. In the dissent, n. 22 at 619–620, it is mentioned that the prescience for this call is obtained through a walk in the "watered garden of academia." While that prescience and call may be appropriate for the academicians, it must be remembered that any garden depends on fertilizer as much as water. An appellate court should not attempt to adjust rules in any case in an ad hoc and after the fact fashion. Such an approach is nothing more than chaotic and evidences an abandonment of the judicial function. It stands as the truest example of government by men, not law.

The dissenting opinion is committed to establishing the innocence of Gale and the culpability of the victims' parents for different crimes, which is obviously not a material concern in resolving this case. That conclusion of Gale's innocence is articulated and reiterated, and the goal of the dissent is to establish what is perceived to be the just result that would have been achieved had the rules been different for this case or had the parents been tried for sexual offenses against the victims. In short, the dissent determines that Gale is innocent, and then reasons from that conclusion. It is not appropriate for any appellate court, particularly a supreme court, to adjust the rules in an ad hoc manner from case to case or crime to crime. There is no question that there are many convicts languishing in *durance vile* who might have been acquitted if some novel or special rule of discovery or procedure had been invoked to govern a particular case. If we are to claim a system of criminal justice and rules that serve that system, however, they must be the same and consistently applied. While it is a favorite technique of defense counsel to try the prosecution or the prosecution witnesses, that tactic has no place in appellate opinions.

As set forth in the dissent, the effort to mix civil discovery concepts into the criminal law is simply inappropriate. The suggestion that the Wyoming Rules of Civil Procedure are invoked in criminal cases by virtue of the language of Rule 1, W.R.C.P., is not only a leap in logic, but also a leap in faith. That faith is not well founded. No credence is given to the proposition that civil discovery can be justified because the same opportunity is available to both parties since that is not true in a criminal case. In arguing for expanded discovery for the defendant, the dissent mentions equivalency, but the concept is fictitious in the criminal arena. The Fifth Amendment stands as a clear bar to reciprocal discovery, and the discovery permitted by Rule 18, W.R.Cr.P., represents the compromise that has been achieved in the criminal law. Furthermore, we must remember that even civil discovery is limited to the bounds of relevance.

Neither should we lightly assume that a witness in a criminal case, whether the complainant or not, is subject to the same requirements for discovery as a party in a civil case. The judiciary should not be so blind as to assume that the constitutions serve only criminal defendants. Others have rights as well. The demand for psychiatric examinations in cases such as this is a call for a rule that victims of sexual assault, primarily women, must not only be stripped of their physical integrity, but they must also surrender their minds and souls at the behest of their tormentors.

In Wyoming, discovery in a criminal case is governed by Rule 18, W.R.Cr.P., and the decisions of this court that have construed it. That rule does not extend to summaries of expert witnesses like Rule 26(b)(1), W.R.C.P. Neither do the ABA Standards for Criminal Justice. The quoted language,

> "(iv) any reports or statements made by experts in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons; * * *." II ABA Standards for Criminal Justice, Standard 11-2.1 (2d ed. 1980),

is no different in substance from Rule 18, W.R.Cr.P., and it does not justify furnishing summaries of the testimony of expert witnesses.

The justification for enhanced discovery because of perjury in this case also requires rebuttal. The dissent adopts a very far ranging concept of perjury. Not every inconsistent statement or fact that impeaches a witness demonstrates perjury. People can be mistaken, and wilful prevarication is not demonstrated in every instance by contrary information. The instances recited in the majority opinion would not serve, in any case, to justify a criminal charge of perjury and might, therefore, be more fairly described as inconsistencies.

The majority opinion addresses the issues actually present in this case in a very professional manner. They are resolved by a correct application of the applicable principles of law. Since it is not an appropriate role for this court to either serve as an advocate for the defendant or as the prosecutor and jury for the parents, I am pleased to join in the disposition of this case that is announced in the majority opinion.

URBIGKIT, Justice, dissenting.

## I. STATEMENT OF FACTS

This case presents the history of Elmer Jean "Gene" Rounsaville (Gene Rounsaville), a fifty-four year old ex-police officer who admitted to sexually molesting two of his five daughters (the eldest is a stepdaughter), probably abused a third and perhaps the youngest twins. It also presents the tragedy of appellant Richard K. Gale, D.D.S. (Dr. Gale), a Gillette, Wyoming dentist, following his conviction of three counts of immoral or indecent acts with three of the Rounsaville children who had previously and subsequently been the victims of their father's incestuous activities for most of a decade. Finally, it presents an ironic situation where a prosecutor agreed not to prosecute the father of sexually molesting his children in return for his

testimony regarding one questionable event with Dr. Gale.

At issue within this exhaustive history is the guilt of Dr. Gale but not the criminal conduct of Gene Rounsaville nor complicity of the mother, Linda Rounsaville. This is not a case for consideration for those with weak stomachs. The facts of non-prosecution of Gene and Linda Rounsaville contrasted with the charged offenses against Dr. Gale belie understanding.

I dissent in reasoning that probabilities provide answers about the truth with a concern engendered by the unfairness of the trial and a residual concern that questionable miscarriage of justice did occur. Fairness, due process and equal protection seem faintly present as a symptom but not the substance of justice. Nearly every motion filed by Dr. Gale for discovery and defense was denied and any contact with agency witnesses or the complainants themselves was proscribed by the prosecutorial forces. Actually, only two motions by Dr. Gale were ever sustained; one was to preemptively challenge the first trial judge and the second was to travel out-of-state for trial preparation with his lawyer. Otherwise, every one of the dozen or so discovery and defensive motions were denied.

The eight arguments for appeal can only be characterized and defined within a considerably more detailed factual analysis than is provided by the majority. This record and documentation, incomplete as it still may be, are encompassed within welfare and school records as well as a modicum of police department material and some parts of the juvenile proceedings. Much of the basic information is not available in this record. What is available was, in significant part, denied to Dr. Gale by rejection of all requested discovery motions.

What do you do in a course of events directly managed to hide miscreants from public observation or individual responsibility? Since Dr. Gale is named, so will be the father, Gene, and the mother, Linda. *See Ross v. Midwest Communications, Inc.*, 870 F.2d 271 (5th Cir.), *cert. denied* — U.S. ——, 110 S.Ct. 326, 107 L.Ed.2d 316 (1989) and *Gilbert v. Medical Economics Co.*, 665 F.2d 305 (10th Cir.1981). The children and other minor participants who were the victims of societal and law enforcement failure will be designated, not by letters, but by age at time of trial.

Actors in this parade of horror include Gene Rounsaville, Linda Rounsaville, and their six children: first daughter, age seventeen (D–17); son, age eleven (S–11); second daughter, age ten (D–10); third daughter, age seven (D–7); and twin daughters, age three (D1–3 and D2–3). The other principal, in addition to the multitude of school personnel, welfare workers and police investigators, is Dr. Gale age forty-one, the family dentist whose substantial bill for dental services went unpaid until at least trial date. Dr. Gale officed and resided in Gillette and the Rounsaville family resided in Rozet, Wyoming, a small rural town thirteen miles to the east of Gillette.

A Department of Public Assistance and Social Services (D–PASS) child protection file was first opened for D–17, questioning parental child abuse in July 1979. That incident, lacking further action, was closed as "I & R for future reference." Action really developed the next year following a slumber party and a complaint involving sexual offenses by Gene Rounsaville, not only with the oldest daughter D–17, but also with two of her friends at the Rounsaville home. Confirming statements from D–17's friends were not actually taken until 1986. No real investigation was made, although a meeting was held on June 30, 1980 where the entire family met with a welfare worker. Following this second opened file, a count reveals eight more contact complaints, D–PASS form SS–219, until 1986 when an active criminal investigation was undertaken because of a sexual abuse complaint against Gene Rounsaville involving D–7, the third-oldest daughter. It is admitted and confirmed that Gene Rounsaville engaged in a course of sexual offenses against D–17, which appears to have commenced at about age eight, two years before the first complaint by school authorities to D–PASS in 1979, and contin-

ued for about six years. Gene Rounsaville also admitted sexual abuse against D–7. The record strongly demonstrates that when Gene Rounsaville started to leave D–17 alone, he commenced a course of sexual misconduct with the second-oldest daughter, D–10. This sexual misconduct continued until 1986. At the same time, sexual misconduct was commenced with D–7 and continued for about two years. Finally, Gene Rounsaville may have engaged in sexually motivated misconduct with his three-year-old twins. A record submitted by D–PASS in 1984 contains interview information that Linda Rounsaville became aware of D–17's molestation by Gene Rounsaville sometime before the welfare worker met with the family on June 30, 1980.

Although a stated prosecutor's open file policy had existed in both law enforcement and county prosecutorial offices for two or more years, perhaps four, obviously all files were not available to Dr. Gale. Climactic events developed after law enforcement officials commenced their first serious investigation of Gene Rounsaville in 1986 which resulted in his arrest. During this investigation of Gene Rounsaville's 1986 sexual offenses, information came to the attention of the investigating officers by comments from the children that a year earlier, Dr. Gale had also committed sexual offenses involving D–17, D–10 and D–7 in a brief episode at the Rounsaville home when the parents were present in the house.

Finite criminal problems of the family are not confined to the slumber party incident and the sexual offenses on at least three of the daughters. In unconfirmed reports which were never really investigated, it was related that Linda Rounsaville's boyfriend raped D–17 and beat up Linda Rounsaville in early 1985. Extreme punishment and physical abuse had also been committed by Gene Rounsaville on all of the older children, including the son, S–11, which involved coat hanger whippings, a belt and possible use of a bull whip.

When the name of Dr. Gale appeared, the county attorney's office and Gene and Linda Rounsaville entered into a custody child protection settlement which required Gene Rounsaville to leave the home and gave both parents prosecutorial immunity from all criminal offenses in exchange for their testimony against Dr. Gale.[1] The documentary detail of prosecutorial conduct, although the reasons for delayed action are not demonstrable since all correspondence cannot be found in this record, shows a developed intent during the investigation of Gene Rounsaville in 1986 to convict Dr. Gale at a price of forgiveness of the incest by Gene Rounsaville and complicity by Linda Rounsaville. The petition filed in district court upon which a custody order was entered included in jurisdictional claim and for probable cause:

The above named minor children are subject to the jurisdiction of this court pursuant to Wyoming Statute § 14–6–203(a)(i), in that they are neglected child[ren] as defined by Wyoming Statute § 14–6–201(a)(xvi)(B), in that they have been abused by the inflicting or causing of physical or mental injury, harm or imminent danger to the physical or mental health or welfare of the children other than by accidental means, to wit: the infliction of excessive or unreasonable corporal punishment by the father, "Gene" Rounsaville; the commission of a sexual offense against one or more of the children by the father "Gene" Rounsaville, and the allowing of the commission of a sexual offense against one or more of the children by their mother, Linda Sue Rounsaville.

* * * On November 17, 1986, Investigator Monty Trenary, of the Campbell County Sheriff's Office and Terry Wal-

---

1. The legal basis for the entry of this immunity from prosecution is not established nor discussed. *See Hennigan v. State*, 746 P.2d 360 (Wyo.1987) (Urbigkit, J., dissenting). Nothing about this case is pretty, and certainly not the conduct of any of the participants. When Linda Rounsaville was initially interviewed in 1986 about Gene Rounsaville's current sexual abuse charges involving the children, her immediate response was:

"'[W]hat do you want me to say? That my husband is * * * my children?' * * * '[Y]es, I believe that he has touched my kids in the past.'"

dorf, a social worker for the Campbell County Department of Public Assistance and Social Services, met at the Rozet School to interview [D–7], a minor child, pursuant to a complaint that she had been sexually molested by her father, "Gene" Rounsaville. The minor, who is 7 years old, told Inv. Trenary and Mrs. Waldorf that her father had begun sexually molesting her when she was approximately 5 years old, and the latest incident was on or about October 28, 1986. The minor said that she had been sleeping in a room with her 11 year old brother when her father came into the bedroom and pulled down her bed covers. He then began rubbing her vaginal area for a while, and then left the bedroom. The minor was uncertain if her father placed his finger inside of her vagina, because he had touched her so much in the past she can't recall the times he did or didn't. The minor also indicated that when her father molested her in the past, he has told her that he would "kill her" if she ever told anyone. The minor's brother, [S–11], also witnessed the sexual assault on the evening of October 28, 1986.

Further investigation by Inv. Trenary and Mrs. Waldorf have revealed an extensive history of physical and sexual abuse upon the children by their father, and a passive acceptance of it by their mother. Mrs. Waldorf has obtained documented reports from the Department of Public Assistance and Social Services dating back to 1980 involving excessive corporal punishment and possible sexual abuse by Mr. Rounsaville. The corporal punishment on the children has taken the form of beatings with coat hangers and other wires as well as leather straps. Additionally, Mr. Rounsaville has been known to fire weapons inside the home and was reported to have placed a gun against his wife[']s head.

[D–17], age 17, has reported an extensive history of being sexually abused by her father, beginning when she was 8 years old. [D–17] also indicated that when she was 9 years old her mother witnessed an incident of sexual molestation, but instead blamed [D–17] for it.

At one point [D–17] indicated that her mother sent her to her aunt[']s home in Utah as punishment for being responsible for the sexual molestation. That occurred in May, 1982, and [D–17] returned in the Fall of 1982. Upon her return, her father molested her once again. [D–17] also reported that her younger sister [D–7], age 7, had been molested by her father in early 1982. [D–17] told her mother about it at that time and her mother then confronted her father. Mr. Rounsaville admitted to having molested [D–17], but denied molesting any of the other girls or their friends. [D–17] also reported that when she was approximately 9 or 10 years of age, her father took nude photographs of her. When her mother discovered the photographs, she accused [D–17] of "being bad" and then burned the photos.

These allegations were confined in detailed investigation reports for the petition which was pursued in November 1986.

To dispose of the petition and concurrent evidence of the course of criminal behavior of Gene and Linda Rounsaville, two juvenile court admission agreements were made. Gene Rounsaville's agreement stated:

Elmer Jean Rounsaville, by and through his attorney, * * *, and the State of Wyoming, by and through its representative, * * *, Campbell County Attorney, have entered into the following agreement relating to the admission/denial phase of this juvenile proceeding. The purpose of the agreement is to secure for Elmer Jean Rounsaville the opportunity to obtain help and keep his family together if possible and further to facilitate the protection of the Rounsaville children through the processes of the juvenile court. It is also a purpose of this agreement to secure, for the state, information and testimony regarding Dr. Richard Gale and his involvement with the Rounsaville family and children. The parties agree as follows: 1. Elmer Jean Rounsaville will admit the following in support of the court taking jurisdiction of his family:

a) That he had sexual contact with his stepchild, [D–17], on several occasions when [D–17] was 7 to 11 years of age. This contact included touching or rubbing of the genital area or breasts.

b) That on two occasions he has whipped his son [S–11] in excess of a reasonable punishment for a child [S–11's] age. That on these occasions he whipped [S–11] with a belt or strap.

c) That he is an alcoholic and as late as the initiation of this proceeding he was often drinking to the point of blackout. This usually was done in his home and around his family causing them a great deal of apprehension and pain. He is informed and now believes he endangered his wife and family during some of these times. This includes but is not limited to the allegation in the petition that he held a gun against his wife's head. This occurred in approximately 1980.

d) That all these actions occurred in Campbell County, Wyoming.

2. Elmer Jean Rounsaville will interview with the Campbell County Attorney's office and will truthfully tell all that he knows about the contact of his family with Dr. Richard Gale including all he knows about sexual contact with any of his children or stepchildren by Richard Gale.

Elmer Jean Rounsaville also agrees to testify completely and truthfully about these matters if he is requested to do so by the Campbell County Attorney's office.

In return for these promises by Elmer Jean Rounsaville the state of Wyoming agrees:

A. No criminal charges for neglect, abuse, assault, incest, illegal sexual contact or any other crime allegedly or actually committed by Elmer Jean Rounsaville against his wife, children or stepchildren will be filed. No charges of any kind will be filed for an incident which allegedly occurred at the Rounsaville's home involving [D–17], [BJC], [CD], [CC], [JH] and others. This incident is the subject of [BJC's] written statement dated 11/18/86. This promise includes any

crime against children or stepchildren or persons named above which occurred after Elmer Jean Rounsaville's taking up residence in the State of Wyoming and before the date of execution of this agreement.

This promise of immunity from prosecution applies whether evidence of the crime(s) comes from Elmer Jean Rounsaville or any other source, and it is binding upon successors in office of the present Campbell County Attorney and staff.

B. The state will seek to prevent under W.S. 26–2–310 the release of the names of any minor victim or information likely to identify that victim in proceedings against Richard Gale.

C. The state agrees that Elmer Jean Rounsaville may have an attorney present during any interviews with the County Attorney's office and during his testimony in court.

Both parties warrant that they enter into this agreement in the utmost good faith. The state's representative warrants that by signing this agreement he has full authority to do so and that the immunity given herein is within his power to give. The state further warrants that it presently has no plans for alternative prosecution of Elmer Jean Rounsaville in any other forum or for any other offense.

Linda Rounsaville's agreement stated:

Linda Rounsaville, by and through her attorney, * * *, and the State of Wyoming, by and through its representative, * * *, Campbell County Attorney, have entered into the following agreement relating to the admission/denial phase of this juvenile proceeding. The purpose of the following agreement is to secure for Linda Rounsaville the opportunity to obtain help and to keep her family together if possible and further to facilitate the protection of the Rounsaville children through the processes of the juvenile court. It is also a purpose of this agreement to secure, for the state, information and testimony regarding Dr. Richard Gale and his involvement with the Roun-

saville family and children. The parties agree as follows:

1. Linda Rounsaville will admit the following in support of the court taking jurisdiction of her family:

a. That Linda Rounsaville had suspicions that Elmer Jean Rounsaville was having sexual contact with [D–17] when she was approximately 9 to 11 years of age. Mrs. Rounsaville did not further investigate that contact and did not notify authorities of her suspicions.

b. That in the fall of 1986, [D–7] reported to Linda Rounsaville that Elmer Jean Rounsaville had sexually molested her. Linda Rounsaville did not believe these statements by the children and the authorities were not notified and Linda Rounsaville did no further investigation or inquiry into the matter.

c. That on approximately the 29th of August, Richard Gale came to the Rounsaville's home and had sexual contact with [D–17] and [D–10]. Linda Rounsaville was informed of this incident by [D–10] and [D–17] but did not report the incident to the police or other authorities and did not do any further investigation of the matter concerning Richard Gale.

2. Linda Rounsaville will interview with the Campbell County Attorney's office and will truthfully tell all that she knows about the contact of her family with Dr. Richard Gale including all she knows about sexual contact with any of her children or stepchildren by Richard Gale. Linda Rounsaville also agrees to testify completely and truthfully about these matters if she is requested to do so by the Campbell County Attorney's office.

In return for these promises by Linda Rounsaville, the State of Wyoming agrees that:

A. No criminal charges for neglect, abuse, assault, incest, illegal sexual conduct, contact or any other crime allegedly or actually committed by Linda Rounsaville against her children will be filed. No charges of any kind will be filed for an incident which allegedly occurred at the Rounsaville's home involving [D–17], [BJC], [CD], [CC], [JH] and others. This incident is the subject of [BJC's] written statement dated 11/18/1986. Also no criminal charges will be filed for any other sexual misconduct or failure to report such sexual misconduct which occurred involving Elmer Jean Rounsaville from the time the Rounsaville's took up residence in the State of Wyoming to the date of the execution of this agreement.

This promise of immunity from prosecution applies whether evidence of the crime or crimes comes from Linda Rounsaville or any other source.

B. The state will seek to prevent under W.S. 26–2–310 the release of the names of any minor victim or information likely to identify that victim in proceedings against Richard Gale.

C. The state agrees that Linda Rounsaville may have an attorney present during any interviews with the County Attorney's office and during her testimony in court.

Both parties warrant that they enter into this agreement in the utmost good faith. The state's representative warrants that by signing this agreement he has full authority to do so and that the immunity given herein is within his power to give. The state further warrants that it presently has no plans for alternative prosecution of Elmer Jean Rounsaville in any other forum or for any other offense.

The case must be summarized in exercised discretion of the prosecutor that conviction of one dentist was better than two parents. The difficulty is the charged events against Dr. Gale were so curious and unlikely as developed a year after the date of a claimed occurrence and only then related conjunctively to the charges against Gene and Linda Rounsaville. The factual situation is particularized since Dr. Gale specifically denied ever being at the Rounsaville's residence on the date claimed and his statement was corroborated with believable testimony.

The Rounsaville family lived in a double-wide modular home in Rozet. The back

door was nailed shut and it is claimed the front door was unlocked. Attached to this dissent as an appendix is a diagram of the home drawn by D–17 at trial which provides a general understanding of the location of the participants within the residence and affords some background as invoked by the issue of denied motions made by Dr. Gale.[2] From that background and the specific testimony given, we are presented with the following:

*D–17's testimony:*

August 29, 1985 at 2:00 a.m., Dr. Gale awakened her with his hand on her stomach, touching her private parts. She got out of bed and went to the bathroom for ten minutes, *spoke to Gene Rounsaville in the living room,* and was told to go back to the bedroom. She then asked her sister D–10, who was in the same room, if she was okay and received an affirmative response. Dr. Gale cornered D–17 between himself and the bed and *fifteen to twenty minutes passed. Gene Rounsaville came down the hall* and Dr. Gale went down the hallway to talk to him. The front door slammed and the family, except for Linda Rounsaville, gathered in the living room before the children were sent back to bed. Dr. Gale came back into the house. There was a fire going in the fireplace and Gene Rounsaville was not drunk and was awake. D–17 also attended a meeting the next morning, after having been called home from baby-sitting for a neighbor, when Dr. Gale returned to the mobile home when both her mother and father were present to meet with him.

*D–10's testimony:*

She was sleeping in the top bunk bed and was awakened. Dr. Gale was beside the bed, touched her legs, and touched and rubbed her private parts while kneeling at the bunk bed. D–17 got out of bed and went to the bathroom. She saw Dr. Gale after D–17 returned ·from the bathroom.

The night light was on in the room and it fell to the floor. Gene Rounsaville got up out of the chair in the living room and got Dr. Gale. Dr. Gale left. A family meeting was held. Shortly thereafter, Dr. Gale came back to get his hat. She was not present the next day when a meeting occurred involving Gene and Linda Rounsaville and Dr. Gale since she was in school.

*D–7's testimony:*

She shares a bedroom with her brother, S–11. She was in the bottom bunk bed and was awakened during the night. Dr. Gale was in the room, pulled down her covers, pulled up her nightgown and pulled down her panties and licked her "monkey." He then "went back to [D–10's] room." D–7's room is across the hallway from D–10's room and the living room where Gene Rounsaville was sitting. Her door was open. She then heard Gene Rounsaville and Dr. Gale talking. Gene Rounsaville had been sleeping in a chair in the living room. The family, except for Linda Rounsaville, gathered that night. She did not attend the meeting the next day when it was said that Dr. Gale returned to get his hat since she was in school.

*Gene Rounsaville's testimony:*

He was sleeping in the chair in the living room, *he waited five or ten seconds* and then went into D–17's room. Dr. Gale was sitting there with a cigarette lighter in his hand. He took Dr. Gale out and escorted him to the door. Dr. Gale came back and was told to leave. He had not been drinking and *there was no fire in the fireplace.* The hallway is two feet wide and he was sitting close to it. He woke up when D–17 came in and got him. Following the incidents of 2:00 a.m., he went out drinking the next morning and returned home mid-morning (*August 30*) to be present for a meeting when Dr. Gale came back to get his hat.

---

2. This is one of two exhibits hand-drawn by the children during the trial and neither provide clarification of size. At no time was either parent more than twenty to thirty feet from the children when the sexual assault events were alleged to have occurred. It was stated they occurred, in part, after D–17 "alerted" her stepfather that Dr. Gale was a visitor to this well-occupied living facility (two parents and six children).

*Linda Rounsaville's testimony:*

The date used by all of the participants was identified from a calendar with a marking which she had made on the 30th of August for August 29. She did not participate in anything during the night since she never woke up. She attended the meeting the *following morning, August 30,* when Dr. Gale said he turned down the wrong hallway. She owed Dr. Gale about $1,100 on the dental bill. She noted the date on the calendar to be sure of the date in case "I decide to turn him in at any time." The back door was not sealed. She was sleeping soundly because of a prescription drug obtained from Dr. Gale that day.

*Dr. Gale's testimony:*

He had been at the Rounsaville residence in the spring of 1985, but none of the events described for August 29 through August 30 had ever occurred. He was home in bed that night and did not go to Rozet the next morning. Dr. Gale indicates the entire story is a conception of someone's imagination and obvious joint preparation. Stormie Gale, his wife, confirmed he was home in bed during that night.

*Larry Maier's testimony:*

Maier was an employee relations manager at Carter Mining Company. He testified from the *records of the mining company* where Gene Rounsaville worked that Rounsaville had worked at the mine, which is some distance from Gillette and Rozet, *from 7:00 a.m. to 3:00 p.m. on August 30, 1985.* The daytime work schedule for that day was separately scheduled in order for Gene Rounsaville to participate in a mine safety project which had been scheduled for August 30 during the day. This witness was not cross-examined, the records were not disputed, and there is no rebuttal

or doubt created about his testimony, except the statements of the Rounsaville family involving the August 30th morning meeting with Dr. Gale *at the Rounsaville house.*

Observedly, the jury accepted the testimony of the Rounsaville family and rejected that provided by the Gale family. Consequently, credibility was absolutely controlling in their decision. It is within the nature of this factual umbrella that the decision of the trial court in denial of requested discovery and case development is to be tested.

## II. ISSUES OF THE CASE

The issues of this case must be accommodated to the facts presented, including recognition that the charged offenses were committed within twenty or, at the most, thirty feet from the physical presence of *both Gene and Linda Rounsaville.* None of the victims raised any verbal objection. Thereafter, testimony is provided about a meeting the following morning that could not have actually happened.[3]

These issues are all directed to the development within the facts presented to review whether a fair trial occurred which include question or denial:

A. Dr. Gale's request for psychological evaluation of the Rounsaville children;

B. Denial of discovery of summaries of expected testimony of the prosecution's expert witnesses;

C. Disclosure of psychological or psychiatric records of the Rounsaville children;

D. Disclosure of D–PASS files;

E. Disclosure of school records;

F. Disclosure of tape recordings; and

G. Denial of motion to dismiss or to suppress for failure to disclose evidence.

---

**3.** All of the children testified they knew the meeting had occurred, although D–17 stated she was present. The younger children were in school and were told about the meeting by their older sister. D–17 said she was not in school, but had been baby-sitting that morning since it was a holiday. It was not a holiday, but apparently her school had not yet started. She had been called home from the neighbor's house where she was baby-sitting to attend the mid-morning meeting with Dr. Gale when he had returned to get his hat. If the meeting did happen as testified, Gene Rounsaville had the capacity to be working at the mine while at the same time drinking in town and to then return to his residence to be present for an unscheduled meeting with Dr. Gale who happened to return to retrieve his hat.

The search for truth which is intrinsic to due process, equal protection and justice cannot be extinguished by discretional denial. If justice is only exercised discretion, then the process is only the rule of man and not of law. To the extent that justification is not provided by the majority in denial to Dr. Gale of the tools to seek the truth, it cannot be accommodated in discretion unless that discretion is related to the facts presented. The movement of this majority away from discretion as seen in *Martinez v. State*, 611 P.2d 831 (Wyo.1980) to the understanding as defined in *Martin v. State*, 720 P.2d 894 (Wyo.1986) postulates this recognition. Discretion does not exist in a vacuum. It should be a rational application of facts to a reasoned decision within a real world of conflicting forces and factors. Truth, except where the actuality is presumed by arbitrary definition, can, to the observer, only be a reasoned probability.

## III. PSYCHOLOGICAL EXAMINATION OF THE ROUNSAVILLE CHILDREN

My disagreement and dissent on the first issue of the psychological examination of the children does not foreclose the exercise of discretion. With discretion recognized, I perceive improper exercise. The rationale of the majority completely misses the logic and ratio decidendi of the voluminous case law. The proper inquiry should be exercised discretion to search for the truth when it is uncontroverted that Gene and Linda Rounsaville both committed perjury at trial. The majority seeks to reconstruct the case of *Ballard v. Superior Court of San Diego County*, 64 Cal.2d 159, 49 Cal. Rptr. 302, 410 P.2d 838 (1966) into a credibility analysis. I pursue a competency inquiry definable within the complexity of

historical occurrences. The minimum protection afforded to sex offense charged defendants only denies prosecution expert testimony about credibility, while we admit W.R.E. 404(b) character evidence with profusion. Those considerations are now extended in this decision to pretrial examinations which is a different decision from the admissibility of tendered evidence. If the general thesis advanced by the majority is valid, medical and psychological assistance to young victims as helpful in analysis for prosecution should never have been permitted. *Cf.* McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray Into the Admissibility of Novel Psychological Evidence*, 77 J.Crim.L. & Criminology 1 (1986). This majority switches justification from pretrial case and status development to apply rules relating to the introduction of expert opinions. We would have got from here to there only if the motion had been granted, the examinations conducted and the expert was then presented to testify, in his opinion, that the criminal offense never occurred.

If justice is a system of proper investigation and case development and presentation of relevant and material evidence to the fact finder, the principle is misunderstood or ignored here. Justice cannot be addressed adequately if the prosecution is given investigatory access and opportunity.[4] Exercise of discretion for this case is confined by facts where information is indispensable for trial preparation. Access to required information for trial preparation is the essence of the trial court's decision. Discretion fails where unequal rights between prosecution and defense result. Fairness, as a principle, demands an opportunity for adequate factual development by

---

**4.** For example, I reject denied access for Dr. Gale to secure properly supervised interviews with the complainants and certainly his insulation from any contact with welfare agency workers and school officials. *People v. Russel*, 69 Cal.2d 187, 70 Cal.Rptr. 210, 443 P.2d 794, *cert. denied* 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968). Availability and justification should be a question of exercised discretion based on validity, relevancy and materiality. If there is no real issue, there is no particularized

justification for usage. Any rational review of this record authenticates, in the midst of these confounding questions of validity, clear doubt of anything wrongfully done by Dr. Gale or probative of a criminal act by him. Full factual investigation for trial presentation was crucially important. The rules of logic and scientific knowledge of chaos teach that anything can happen, no matter how improbable. Improbability teaches that it likely did not occur. Here, probability outweighs chaos.

either litigant. *People v. Hunter,* 374 Mich. 129, 132 N.W.2d 95 (1965); *State v. Franklin,* 49 N.J. 286, 229 A.2d 657 (1967); *State v. Butler,* 27 N.J. 560, 143 A.2d 530 (1958).

Three separate choices for consideration of psychiatric examination are generally revealed by present rules of civil procedure and criminal law applications. The first is to deny discretion to the trial court to approve that requirement for the complainant. The second considers that the issue is soundly bounded in exercised discretion.[5] Finally, the third would prove a defendant's right to secure the examination.

Dr. Gale does not contend that discretion did not exist. Rather, he argues that the decision is factually unrelated to the case and the request was improperly denied as abused discretion. The holding of the majority is confusing in intermixing absence of discretion with exercise of discretion in first rejecting the discretion cases of *People v. Russel,* 69 Cal.2d 187, 70 Cal.Rptr.

210, 443 P.2d 794, *cert. denied* 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968) and *Ballard,* 49 Cal.Rptr. 302, 410 P.2d 838 and then conceding that the trial court acted under its discretion. There will likely be few if any fact sensitive cases comparable to this unbelievable and clearly perjury pervaded trial scenario. That some of the witnesses lied comprehensively cannot be questioned, that Gene and Linda Rounsaville committed significant misstatements cannot be challenged, and that the meeting scripted for August 30 did not occur is dispositively authenticated. If the majority were to say that the State in prosecution cannot secure psychiatric testimony by medical witnesses for case presentation, then equivalency for denial to the defendant would at least exist. That is neither the general law nor well-followed Wyoming precedent. I agree with Dr. Gale that the decision of whether psychiatric evaluation should be required is a matter of discretion and, if discretion was exercised here, the denial was improper as abused.[6]

5. In this case, the decision made by the trial court may have been discretionary, but clearly unfair to the defendant. The search for truth seems lost wherein:

> The Court has, first, decided in its discretion that it is not appropriate in this case to require these minor children to submit to the trauma of undergoing the indignity of a psychiatric examination. I do not find that there is any compelling reason for it in this case. The trauma attending the role of these minor complainants in sex offense prosecution would be sharply increased by the indignity of a psychiatric examination, the examination itself might serve as a tool of harassment and, if granted routinely, such request might well deter victims from lodging any complaint at all.
>
> \* \* \* \* \* \*
>
> In discussing the disclosure of psychiatric records sought by the defendant's motion, there has not been shown to exist any such psychiatric examinations or records to this Court up to this time. I will simply repeat what I have said earlier, that under the due process clause this Court recognizes that the State has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment, but there is no general constitutional right to discovery in a criminal case and the *Brady* case did not create one. *Pennsylvania v. Ritchie, supra* [480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)]. In any event, should it

> be brought to the Court's attention that there are psychiatric records of the minor complainants in this case, the Court will consider them in camera as it has the other confidential information sought by defendant to determine their materiality.

6. Another non-sequitur is conjecture of possible refusal by the complainants to participate in the examination. That issue was not reached and is at best ephemeral in the context of the juvenile proceedings and admitted sexual abuse by Gene Rounsaville on his children with complicity by Linda Rounsaville. See *Ballard,* 49 Cal.Rptr. at 313, 410 P.2d at 849, which states "[t]he complaining witness should not, and realistically cannot, be forced to submit to a psychiatric examination or to cooperate with a psychiatrist. In the event that the witness thus refuses to cooperate, however, a comment on that refusal should be permitted." See, however, *Butler,* 143 A.2d 530.

It is also disturbing to see the decision rested by citation on the effect of the children of a psychiatric evaluation in relation to the sloganistic law journal article. If justice is the search for truth, where do we position this decade long course of sexual abuse of the children by Gene Rounsaville, including admittedly more recent abuse than this present event and then prosecutorial absolution when an investigation was finally commenced? I do question, even today, whether the deals were validly made and whether prosecution can still be pursued if, in fact, justice demands punishment for criminal conduct. Clearly, *no statutory basis for the immu-*

We do not proceed into a subject of first impression. Generally, see Annotation, *Necessity or Permissibility of Mental Examination to Determine Competency or Credibility of Complainant in Sexual Offense Prosecution*, 45 A.L.R.4th 310 (1986).[7] The similar case was *Ballard*, 49 Cal.Rptr. at 313, 410 P.2d at 849 (emphasis in original and footnotes omitted):

Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to order a psychiatric examination of the complaining witness in a case involving a sex violation if the defendant presents a compelling reason for such an examination. The Supreme Court of South Dakota recently stated, "In an article entitled Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach, in Vol. 48, Cal.L.Rev. 648 at page 663, this conclusion is reached: 'Most of the courts which have dealt with this problem have recognized the authority of the trial judge to order a psychiatric examination of a witness on the question of credibility. The principle established by the ma-

jority of the cases is that the judge has the *discretion* to order such an examination, although the failure to do so has rarely been held an abuse of discretion.' We are not aware of any good reason why that should not be the rule concerning complaining witnesses in sex offenses." (*State v. Klueber, supra*, [81 S.D. 223], 132 N.W.2d 847, 850 (1965); * * *.)

We therefore believe that the trial judge should be authorized to order the prosecutrix to submit to a psychiatric examination if the circumstances indicate a necessity for an examination. Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity. Thus, in rejecting the polar extremes of an absolute prohibition and an absolute requirement that the prosecutrix submit to a psychiatric examination, we have accepted a middle ground, placing the matter in the discretion of the trial judge.

nity existed. The only statutory provision for a grant of immunity in Wyoming is provided for drug case prosecutions. W.S. 35-7-1043.

7. Directly converse positions which consider the fair trial and due process rights of the accused against rights of privacy are noted in Comment, *Psychiatric Testimony for the Impeachment of Witnesses in Sex Cases*, 39 J.Crim.L. & Criminology 750, 751 (1949):

Unfortunately, the present rules of evidence hinder rather than aid a proper inquiry into the veracity of complaints about sexual misconduct. These rules are usually adequate and appropriate in the ordinary case, but there are certain factors in sex cases which require a relaxation of the common law exclusionary rules respecting evidence as to character. Adequately probing the truth of a complaint against a man charged with a sexual crime is difficult when the charge may stem from the psychic complexes of the female complainant.

The author in O'Neale, *Court Ordered Psychiatric Examination of a Rape Victim in a Criminal Rape Prosecution—Or How Many Times Must a Woman Be Raped?*, 18 Santa Clara L.Rev. 119, 119-20 (1978) said:

Initially, this article provides an overview of the present law governing the use of psychiatric evidence in rape cases, focusing on California's experience. After developing this

overview, the article demonstrates that the court ordered psychiatric examination is merely one of a host of special procedures utilized by the legal system in sex offense cases. Then, the article explores the key role traditional attitudes have played in the formulation of the present law, and exposes the lack of foundation for these attitudes given the current realities of rape prosecution. Since these attitudes have little or no basis in reality, the article concludes that the use of psychiatric examinations based on such assumptions should be severely restricted, if not abandoned.

Other views on the subject are to be found in Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach*, 48 Calif.L. Rev. 648 (1960); Comment, *Pre-trial Psychiatric Examination as Proposed Means for Testing the Complainant's Competency to Allege a Sex Offense*, 1957 U.Ill.L.F. 651 (1957); Comment, *Psychiatric Evaluation of the Mentally Abnormal Witness*, 59 Yale L.J. 1324 (1950); and Recent Case, *Criminal Law. Psychiatric Aid in Evaluating the Credibility of a Prosecuting Witness Charging Rape*, 26 Ind.L.J. 98 (1950).

Clearly, the justice delivery system has advanced for a rational access to actual facts since *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), where a physical examination in advance of trial was denied. *See* F.R.C.P. 35 (W.R.C.P. 35).

See likewise the Kansas court in *State v. Gregg*, 226 Kan. 481, 602 P.2d 85, 91 (1979):

> We, too, adopt the "middle ground" and hold a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination. Even if a trial court finds a compelling reason for ordering the psychiatric examination, the further safeguard as to its admissibility remains.

The voluntary confession case of *State v. Jerousek*, 121 Ariz. 420, 590 P.2d 1366, 1371 (1979) does not reveal a contrary persuasion in the conclusion:

> The need for a psychiatric examination of a victim of a sex crime would generally arise "only if little or no corroboration supported the charge *and* if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity." (Emphasis added.) *Ballard*, 64 Cal.2d 159, 176, 49 Cal.Rptr. 302, 313, 410 P.2d 838, 849.
>
> In the instant case, the victim's testimony was corroborated not only by the defendant's confession but by the testimony of several neighborhood children. (The competency of these children was not challenged.) It was, therefore, not an abuse of the trial court's discretion to find a psychiatric examination of the victim unnecessary.

Proper exercised discretion was found by the appellate court in the consent contested rape case of *Government of Virgin Islands v. Scuito*, 623 F.2d 869 (3rd Cir. 1980). Special circumstances for exercised discretion were also found to be absent in *People v. Estorga*, 200 Colo. 78, 612 P.2d 520 (1980). See, likewise, *People v. Piro*, 671 P.2d 1341 (Colo.App.1983).

The second significant case which clarified the two-stage decisional process is *Russel*, 70 Cal.Rptr. 210, 443 P.2d 794. The reasoning for this majority to reject *Russel* lacks clarity. The *Russel* court recognized the involvement of discretion in a first decision whether the psychological examination of the complainant would be ordered if requested by the defendant. The test was exercised discretion with evidentiary factors to be weighed in decision. *Id.*, 70 Cal.Rptr. at 216 n. 8, 443 P.2d at 800 n. 8. Then only is a decision presented whether admissible testimony might be tendered at trial. That decision is just not present here since the examination was not first permitted. Relevancy and materiality of tendered evidence is totally academic. Actually, defendant's initial interest was discovery and rights of effective cross-examination with the constitutional guaranty of confrontation. If we accept Dr. Gale's contention as attempted trial preparation that the children would lie—he wanted to know why.

In regard to discretion, the court in *Russel*, 70 Cal.Rptr. at 215–216, 443 P.2d at 799–800 comprehensively analyzed:

> We have explicated the concept of judicial discretion on innumerable occasions and in a variety of factual contexts. Obviously the term is a broad and elastic one (see 27 C.J.S. p. 292) which we have equated with "the sound judgment of the court, to be exercised according to the rules of law." (*Lent v. Tillson* (1887) 72 Cal. 404, 422, 14 P. 71, 78.) We have also declared that the "only limitation that the law had placed upon the exercise of discretionary judicial power is that it must not be abused." (*Clavey v. Lord* (1891) 87 Cal. 413, 419, 25 P. 493, 495, observing at the same time that "it may be difficult to define exactly what is meant by abuse of judicial discretion * * * *" (idem). However we have said: " 'In a legal sense discretion is abused whenever in the exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*State Farm, etc., Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428, 432, 304 P.2d 13, 15, quoting *Berry v. Chaplin* (1946) 74 Cal.App.2d 669, 672, 169 P.2d 453; see also *Continental Baking Co. v. Katz* (1968) 68 A.C. 527, 542, 67 Cal.Rptr. 761, 439 P.2d 889 and cases therein cited.)
>
> The courts have never ascribed to judicial discretion a potential without restraint. In the early case of *Bailey v. Taaffe* (1866) 29 Cal. 423, at page 424, this court took pains to delineate limits of judicial discretion in the following

terms: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised ex gratia, but a legal discretion, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." Similar standards were expressed in *Gossman v. Gossman* (1942) 52 Cal. App.2d 184, 195, 126 P.2d 178, 184, where the court quoted from *Davis v. Boston Elevated Ry. Co.* (1920) 235 Mass. 482, 496–497, 126 N.E. 841 as follows: " 'The word imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion, enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy nor warped by prejudice nor moved by any kind of influence save alone the overwhelming passion to do that which is just.' "

The foregoing authorities, and particularly the passages quoted from *Bailey* and *Gossman,* make it quite clear, we think, that all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue. We shall here undertake to briefly outline some of the considerations relevant to discretionary determinations concerning the production and admission of psychiatric evidence bearing on credibility.

With decision made for the examination then merged in review to relate connection between the examination decision and the admissibility of evidence, it was stated:

In our *Ballard* opinion we set forth in a footnote (which is quoted in relevant part in the margin) some of the "dangers" involved in the use of psychiatric evidence to impeach credibility. As we there suggested, each of the considerations indicated is a factor to be weighed by the court at some point in the course of its overall determinations relative to the production and admission of such evidence. It must be observed, however, that some of these factors pertain for the most part to determinations undertaken at the time of passing upon the motion for examination, while some are peculiarly relevant to determinations undertaken when the products of an ordered examination are sought to be introduced into evidence.

\* \* \* \* \* \*

When such an examination *has* been ordered by the court, however, and evidence based upon it is sought to be introduced, the court must address it[s]elf to considerations dealing with the specific evidence offered.

*Id.,* 70 Cal.Rptr. at 216, 443 P.2d at 800 (emphasis in original and footnotes omitted).

The court in *Russel* was not presented with a challenge for improper discretion in sustaining the ordered examination since it was permitted and only based the decision on denied admissibility which provided the basis for conviction reversal. *Cf. State v. Boutwell,* 18 Conn.App. 273, 558 A.2d 244, *certification denied* 212 Conn. 803, 561 A.2d 945 (1989), admissibility review. Case law which has followed the *Ballard* test includes *Pickens v. State,* 675 P.2d 665, 669 (Alaska App.1984) in examining a basis for a "specific showing of need" and that the complainant's "testimony was uncorroborated or otherwise untrustworthy." The basic prerequisite for the requirement of an examination considered that the court be "sensitive to the privacy interests of the witnesses generally and reluctant to permit inquiry into a witness's mental health history absent a clear indication of relevance." *Id.* at 669. *See also Murphy v. Superior Court In and For Maricopa County,* 142 Ariz. 273, 689 P.2d 532 (1984); *State v. Wahrlich,* 105 Ariz. 102, 459 P.2d 727 (1969); *McDonald v. State,* 307 A.2d 796 (Del.Super.1973); *Dinkins v. State,* 244 So.2d 148 (Fla.App.1971); *State v. Kahinu,* 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied* 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973); *People v. Visgar,* 120 Ill.App.3d 584, 75 Ill.Dec. 784, 457 N.E.2d

1343 (1983); *People v. Glover*, 49 Ill.2d 78, 273 N.E.2d 367 (1971), involving discretionary denial where no compelling reason advanced for the examination; *Easterday v. State*, 254 Ind. 13, 256 N.E.2d 901 (1970); *State v. Sullivan*, 360 N.W.2d 418 (Minn. App.1985); *State v. Boisvert*, 119 N.H. 174, 400 A.2d 48 (1979); *State v. R.W.*, 104 N.J. 14, 514 A.2d 1287 (1986); *State v. Romero*, 94 N.M. 22, 606 P.2d 1116 (1980); *State v. Clasey*, 252 Or. 22, 446 P.2d 116 (1968); *State v. Klueber*, 81 S.D. 223, 132 N.W.2d 847 (1965); *State v. Ayers*, 369 S.E.2d 22, 27 n. 4 (W.Va.1988) as a discretion to deny second examination by a motion "inadequately documented;" and *State v. Miller*, 35 Wis.2d 454, 151 N.W.2d 157 (1967). The majority's posture is surveyed in *State v. Walker*, 506 A.2d 1143, 1147 (Me.1986) which recognized that "[c]ourts in most states have held that the grant or denial of a motion to compel victims of sex abuse to submit to psychological testing rests within the sound discretion of the trial judge." Authority to order examination in these courts is not at issue, only discretional exercise. *See Franklin*, 229 A.2d 657.

It is recognized there are cases essentially rejecting authority to order the examination. *See State v. Looney*, 294 N.C. 1, 240 S.E.2d 612 (1978), suggesting statutory application.[8] Likewise, in *State v. Liddell*, 211 Mont. 180, 685 P.2d 918 (1984), the court permitted the state to provide rape trauma syndrome expert witness testimony, but denied expert witness examination requested by the defendant. *See also Com. v. Widrick*, 392 Mass. 884, 467 N.E.2d 1353 (1984); *People v. Souvenir*, 83

Misc.2d 1038, 373 N.Y.S.2d 824 (1975); and *State v. Lairby*, 699 P.2d 1187 (Utah 1984). The posture of this line of cases denying any discretion of the trial court to order the examination is clearly the minority approach in jurisdictions in which it is considered. See, generally, cases listed in *Franklin*, 229 A.2d 657 and Annotation, *supra*, 45 A.L.R.4th 310.

I am neither bothered nor bewildered by application of the strong requirements for demonstration of justification including either a compelling reason from *Ballard*, 49 Cal.Rptr. 302, 410 P.2d 838 or a specific showing of need from *Pickens*, 675 P.2d 665. *In this case*, however, first following the majority's consideration of discretion, I would find an adequately demonstrated basis and consequent abuse of discretion in denial under these circumstances.

Need remains to address the conjecture of the majority that the allowance as discretion is foreclosed by earlier Wyoming precedent. Dual misapprehensions are invoked in that contention. In first consideration, the present issue is not admissibility of evidence, *Russel*, 70 Cal.Rptr. 210, 443 P.2d 794, but examination prior to trial. In second misconstruction, the question of what opinion evidence may be admissible need not expire on the logic of *Zabel v. State*, 765 P.2d 357 (Wyo.1988) with which I concurred. I have strongly dissented, in prior unsuccessful arguments, to a whole series of prosecutorial expert witnesses which are used to corroborate the complainant's testimony. *Brown v. State*, 736 P.2d 1110 (Wyo.1987). That posture on the

**8.** That court, however, noted that "[o]bviously, there are types of sex offenses, notably incest, in which, by the very nature of the charge, there is grave danger of completely false accusations by young girls of innocent appearance but unsound minds, susceptible to sexual fantasies and possessed of malicious, vengeful spirits." *Looney*, 240 S.E.2d at 622. Justice Exum, in concurrence, indicated:

As have most of the well-considered decisions on the subject, to which the majority refers, I would conclude that our trial judges have the power, to be carefully used in the exercise of their sound discretion, to order in appropriate circumstances the psychiatric examination of any witness as a condition to receiving the testimony of that witness. In

this case the denial of defendant's motion for such an examination was well within the discretion of the trial judge and should not be held for error.

As the majority wisely recognizes the witness' rights must be given due consideration. Defendant should be required to make a strong showing that the witness' mental make-up is such that a psychiatric examination would probably reveal either that the witness is incompetent or that the witness' credibility may be subject to serious question. Situations calling for the entry of such an order would, it seems, be rare indeed. But if called for, our judges should have the power to enter the order.

*Id.* at 628.

*Zabel* rule does not rationally decide the constitutional rights of Dr. Gale.

Since we are not presented with evidence admissibility questions, a close look at *Zabel*, 765 P.2d 357 as well as *Griego v. State*, 761 P.2d 973 (Wyo.1988); *Brown*, 736 P.2d 1110; *Scadden v. State*, 732 P.2d 1036 (Wyo.1987); *Lessard v. State*, 719 P.2d 227 (Wyo.1986); and *United States v. Azure*, 801 F.2d 336 (8th Cir.1986), provide no authority for a denial of pretrial examination. How and to what extent the expert witness might testify is not presented on appeal. See, however, *Russel*, 70 Cal.Rptr. 210, 443 P.2d 794; *Easterday*, 256 N.E.2d 901; and *Butler*, 143 A.2d 530. At this juncture, the issue was due process in adequacy of information for proper trial preparation. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Cf. State v. Hennum*, 441 N.W.2d 793 (Minn.1989), where the court first rejected admissibility of battered woman syndrome evidence particularized to the defendant and then rejected right of prosecution to obtain her mental examination.

## IV(A). DENIED DISCOVERY

This appeal is anchored basically on a due process examination derived from trial court denial of access to information for an adequate defense. With recognition by the prosecution that a factual conflict did exist, this due process inquiry, resulting from denied discovery and deterred trial preparation, assumes importance in denied access to justice for the charged defendant.[9]

9. References in the testimony about the work schedule of Gene Rounsaville, in accord with the witness called by Dr. Gale, demonstrated it was not possible for Rounsaville to have attended a meeting with Dr. Gale on the morning of August 30. This uncontroverted testimony destroys the credibility of the dating for the entire occurrence.

> MS. PATTON: Yes, Your Honor. The state would like to recall Mr. Gene Rounsaville for a matter of correction, and I will need to go downstairs to get him.
>
> MR. MARKS: May we approach the bench, Your Honor?
>
> THE COURT: Yes.
>
> (The following proceedings had at the bench, outside the hearing of the jury.)
>
> MS. PATTON: Your Honor, I found out that his work record for August, 1985, indicates that he was at work on the 29th, that he was not at work on the 30th, and there's no apparent explanation for that. I believe it's appropriate to correct the record, rather than being accused of withholding exculpatory material.
>
> THE COURT: What's your position if Mr. Rounsaville is recalled for that purpose?
>
> MR. MARKS: If I understand what you are saying, is that on the 29th, in the morning, he was at work, and on the 30th he was home. The next day he was home, is that what you are saying?
>
> MS. PATTON: Well, it's not real clear. The cards indicated that on the 29th he was working the graveyard shift, and on the 30th he was not.
>
> Now I don't want it to come up that we knew and didn't let you have that. He testified that he didn't really know what day it was.

> MR. MARKS: I definitely want that in. If they don't want to call him and put that in, I will call him.
>
> THE COURT: Let me ask you before we do that, can you find—in other words, I don't want the jury confused. I don't know when he worked on the 29th, whether it would be from midnight to 8 a.m. on the 29th, or he didn't work the midnight shift. I don't know whether that occurred from midnight the 29th through 8 a.m. on the 30th, whatever it was on the 30th. I want you to ascertain that from the custodian of the records and not leave it hanging. I think it should come in at some point. I am taking an extra half hour at noon for Mr. Hayden, and perhaps between the two of you, you can get the work record and can get somebody, the custodian of the record, to tie it in.
>
> MS. PATTON: We have copies.
>
> THE COURT: Can you find somebody to verify it? You said it was confusing.
>
> MR. GEER: Your Honor, I believe that we can obtain testimony, not within a few minutes, but within a couple of hours.
>
> THE COURT: Mr. Geer thinks he can have the verification, and then if you want to recall him, we will leave it that way.
>
> MR. MARKS: Do you have another witness?
>
> MS. PATTON: That's the problem. I was going to rest.

The evidence by the employer witness, Larry Maier, established that Gene Rounsaville worked the midnight shift Thursday, August 29th (11:30 p.m. to 7:30 a.m.) and the daylight morning shift Friday, August 30th (7:00 a.m. to 3:00 p.m.). Consequently, he was at work at the mine at the time that he testified that the morning meeting with Dr. Gale occurred following

The course of preparatory efforts and denied discovery to Dr. Gale is consequently significant. The record in itself established documentation, which was not made available to defense counsel, that "someone" had told D–PASS workers not to talk to Dr. Gale's representative. Interviews with the children were not possible and nothing other than written interview statement information from investigating officers regarding the Rounsaville family was available.

On December 12, 1986, Dr. Gale filed a general notice for discovery in typical form requesting all available documentation held by law enforcement officials and the prosecutor. A motion for a bill of particulars was filed February 27, 1987. On March 5, 1987, the State filed a motion in opposition to the requested bill of particulars, stating that everything had been furnished including the criminal file of *State of Wyoming v. Gene Rounsaville*, Docket No. 86CR–8813. On April 6, 1987, Dr. Gale filed a motion to dismiss or, in the alternative, to suppress testimony for failure to preserve evidence. The basis of the motion challenged failure to record interviews by audio or video tape, resulting in the prosecutorial failure to collect or preserve material evidence. On April 6, 1987, an amended motion for bill of particulars and points and authorities was filed, realleging the requirement for greater specificity in the charges. The request was supported in detailed analysis and case law. A motion for psychiatric examination, which was discussed in section III of this dissent, was likewise filed April 6, 1987. Additionally, a motion for disclosure of tape recordings or

transcript of the juvenile court hearings and a motion for pretrial discovery, including requests itemized in eighteen paragraphs for informational documentation, were filed on April 6, 1987. Additional motions filed on April 6, 1987 included a motion to dismiss or, in the alternative, to suppress testimony of the Rounsaville family premised on the immunity agreement made by Gene and Linda Rounsaville with prosecutor's authority; a motion to compel the disclosure of psychiatric records; a motion for disclosure of impeaching information; and a comprehensive memorandum brief in support of these motions for discovery. Every one of these motions were ultimately denied. No judicial support was given to reach the due process goal of *Bagley*, 473 U.S. 667, 105 S.Ct. 3375; *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); and *Brady*, 373 U.S. 83, 83 S.Ct. 1194. *See* Quinn, *Standards of Materiality Governing the Prosecutorial Duty to Disclose Evidence to the Defense*, VI Alaska L.Rev. 147 (1989).

Topics included in discussion in the memorandum brief in support of the motions for discovery were:

1. Dr. Gale is entitled to immediate W.R.Cr.P. 18 discovery;

 (a) Dr. Gale's own statements;

 (b) Documents and tangible objects;

 (c) Scientific reports and tests.

2. Dr. Gale is entitled to discover the conviction record of all government witnesses.

---

the 2:00 a.m. incident. Apparently this exchange first revealed to the prosecution that the witness had lied. There was no rebuttal testimony conflict with the employer's records and, consequently, without cross-examination or rebuttal, the testimony is not in dispute that Gene Rounsaville could not have attended a meeting on August 30th because he was at work at the coal mine. Furthermore, it was established that his schedule for that time had been predetermined and, contrary to the intimation of the prosecution, there was no basis upon which he could have expected to have worked the night before when the events were alleged to have occurred. D–17 testified she was present when

Dr. Gale came back in the morning. D–10 admitted she was not present and all she knew was what she had been told by either D–17 or her mother. D–7 thought it was winter, but she was not there the next morning. All she knew was what was told to her by D–17. Why the family testified to a meeting that did not occur authenticates the entire philosophy upon which discovery is founded so that exculpatory information will not be hidden. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Giglio*, 405 U.S. 150, 92 S.Ct. 763; *Brady*, 373 U.S. 83, 83 S.Ct. 1194; *Pitchess v. Superior Court of Los Angeles County,* 11 Cal.3d 531, 113 Cal. Rptr. 897, 522 P.2d 305 (1974).

3. Dr. Gale is entitled to immediate discovery of all exculpatory evidence in the possession of the government.

4. Dr. Gale is entitled to a government witness list.

5. Dr. Gale is entitled to eventually inspect all Jencks Act statements and is entitled to immediate inspection of other documents reflecting non–Jencks Act exculpatory statements of witnesses.

Filed also on April 6, 1987 was a motion for disclosure of all Campbell County D-PASS files and a motion for discovery of school records. With the motions, subpoenas were served on D-PASS to produce records for the anticipated motion hearing; on the Sheriff to furnish psychiatric records concerning Linda Rounsaville, Gene Rounsaville, D–17, D–10, S–11 and D–7; on the prosecuting attorney for production of books, documents or tangible materials relating to the juvenile admission agreements between the State and Gene and Linda Rounsaville; to the Clerk of the District Court to produce juvenile proceeding files for the children; to the school district for school files; and to the private school attended by D–17 for her school records. Responsive to the subpoenas, an objection and motion to quash subpoena duces tecum was filed by the State in behalf of the D–PASS organization.

On April 23, 1987, the prosecuting attorney moved for notice of alibi and for an order requiring reciprocal discovery, requiring Dr. Gale to make available for examination and inspection, photocopying, etc. the following:

1. List of all witnesses that the defendant intends to call at the trial in this matter.

2. Copies of any and all written statements made by the witnesses to be called by the defendant (excluding statements of the defendant), and copies of all tape recorded interviews of the 3 minor victims and transcripts thereof.

3. Any scientific or medical reports, books, papers, documents, or other tangible objects the defendant expects to produce at trial.

4. Production for viewing of any and all tangible evidence in the possession of the defendant that the defendant expects to introduce at trial.

Compliance was provided by Dr. Gale without entry by the trial court of a formal order. *See Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) and *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). *See also* Comment, *Limiting Prosecutorial Discovery Under the Sixth Amendment Right to Effective Assistance of Counsel: Hutchinson v. People,* 66 Den.U.L.Rev. 123 (1988) and 2 W. LaFave and J. Israel, *Criminal Procedure* § 19.4 (1984).

A hearing was held on April 24, 1987 on all pretrial motions. Subsequently, on May 1, 1987, the State filed a motion in opposition to Dr. Gale's motion for psychiatric examination; a motion in opposition to Dr. Gale's motion for disclosure of tape recordings or transcript of the juvenile court hearings; a motion in opposition to Dr. Gale's motion to dismiss or, in the alternative, to suppress testimony for failure to preserve evidence; a motion in opposition to Dr. Gale's motion to dismiss or, in the alternative, to suppress the testimony of the Rounsaville family; and a response to Dr. Gale's motion for pretrial discovery, contending generally that all documentation had been or would be furnished as requested involving reports, confessions, all statements of Dr. Gale and other available documentation. On May 8, 1987, Dr. Gale filed a response to the State's opposition to the motion to dismiss or, in the alternative, to suppress testimony for failure to preserve evidence; and his witness and exhibit lists in detail. Dr. Gale filed a notice of his defense; a response to the State's opposition to his motion for disclosure of tape recordings or transcripts of juvenile court hearings; a response to the State's demand for notice of alibi; and a further motion to compel. A further affidavit was filed in support of all previously filed discovery requests in detail from the licensed consulting psychologist employed by Dr. Gale stating a factual premise for the request. A further motion to produce was filed May 14, 1987 to obtain notes,

memoranda, etc. relating to contact between members of the Sheriff's office with any designated witness proposed by Dr. Gale.

Each requested item of discovery was denied in an opinion letter filed May 18, 1987. The equivalency criteria of *Wardius*, 412 U.S. 470, 93 S.Ct. 2208 and *Williams*, 399 U.S. 78, 90 S.Ct. 1893 was not required. Denial of the motion to dismiss or, in the alternative, to suppress testimony was premised on the lack of demonstrable inducement. The motion for disclosure of school records was denied on the basis of an in camera review and the determination that nothing of materiality or relevance existed. The motion for disclosure of the D–PASS files was denied on the basis that part of the files had previously been furnished and the additional material, examined in camera, was asserted to be immaterial and irrelevant in stating:

This has been done pursuant to the holding in *Pennsylvania v. Ritchie*, 480 U.S. [39], 94 L.Ed.2d 40, 108 [107] S.Ct. [989] (1987). The materiality and relevance of the materials reviewed was determined pursuant to the definition of materiality contained in the *Pennsylvania v. Ritchie* case, which stated "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A [ ] 'reasonable probability is a probability sufficient to undermine confidence in the outcome'."

The trial court considered the motion to dismiss or, in the alternative, to suppress testimony for failure to preserve evidence and found that the defense failed to meet the test of the United States Supreme Court in *California v. Trombetta*, 467 U.S. 479, 479, 104 S.Ct. 2528, 2529, 81 L.Ed.2d 413 (1984) by statement that the material " 'must possess an exculpatory value that was apparent before the evidence * * * was destroyed, and [must also] be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' It is obvious in the instant case that these two conditions have not been met." The motion for pre-

trial discovery was answered by comment that either the item had been resolved by oral rulings or the State agreed to furnish, which is the instant subject of this segment of this dissent:

The defendant has requested that there be furnished to him the substance of the opinions which any expert witness to be produced by the State is expected to testify to and the factual basis for each factual opinion of the expert. The State has objected to the defendant's request for the substance of the expert opinion to which the expert is expected to testify and the factual basis for each such opinion. Rule 18(a)(ii) requires the State to permit the defendant to inspect and copy any relevant "results of reports of … scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody, or control of the State, the existance [sic] of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney …". The material requested by the defendant in the instant case does not appear to be mandated by Rule 18 under the quoted subsection or any other portion thereof and accordingly the defendant's motion is denied to that extent.

In regard to the motion for disclosure of impeaching information, the trial court said:

The Court has considered the defendant's "Motion for Disclosure of Impeaching Information". Under the principles set forth by the Supreme Court in previous opinions and reiterated in *Pennsylvania v. Ritchie, supra,* defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. Unless the defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the Court's attention, the prosecutor's decision on disclosure is final. If a defendant is aware of specific information contained in a confidential file, he is free to request it directly from the Court and argue in favor of its materiality. Moreover, the duty to disclose is ongo-

ing; information that may be deemed immaterial upon original examination may become important as the proceedings progress and therefore this Court, having denied certain of the confidential matters in its rulings above and also it's subsequent ruling below, still feels obligated to release any information that may later appear material in the fairness of the trial, and will do so.

Disposing then of the request for psychiatric examination, the trial court concluded that it was not appropriate to require the children to submit to the trauma of undergoing the indignity of a psychiatric examination. *See* n. 5, *supra.*

The problem with this conclusion and the entire sequence of denied discovery is the fact that the events could not have occurred in accord with the testimony presented in prosecution and, if proper discovery had been allowed, dispositive proof could have more appropriately been developed before the time the prosecution was about to close and found that records in her hands had revealed that perjury had already been committed in regard to the mid-morning meeting (unless the employment time records possessed by prosecution were different than the record furnished by the mine supervisor and introduced into evidence without objection).

The relationship between discovery and due process and the inaneness of the blase critique that there is no constitutional right to discovery as a constituent of due process cannot be more vividly illustrated. 2 W. LaFave & J. Israel, *supra,* § 19.3 at 481. The relationship between the prosecutorial standard of conduct and denial of accountability by immunity also cannot be ignored. Beatty, *The Ability to Suppress Exculpatory Evidence: Let's Cut Off the Prosecutor's Hands,* 17 Idaho L.Rev. 237 (1981); Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth?,* 1963 Wash.U.L.Q. 279 (1963); Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose,* 40 U.Chi.L.Rev. 112 (1972). Effectiveness of counsel cannot be better than the due process opportunities for adequate preparation. *Strickland v. Wash-*

*ington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); Babcock, *Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel,* 34 Stan.L.Rev. 1133 (1982).

Somewhere in the records of the prosecutorial files and police officialdom, there are interview statements where Gene Rounsaville stated that on the morning of August 30, he first went out drinking and then came home to the mid-morning meeting with Dr. Gale. Somewhere also in those files are time cards which demonstrate without question, as was determined by another witness whose significance in testimony was obviously missed by the participants at trial, that none of this occurred at that time and that on the morning of August 30, instead of going out drinking, Gene Rounsaville went to work to attend a safety meeting session held by his employer which was the reason for the scheduled change from his normal graveyard working hours during that period. Somewhere also to be found are school records which would directly relate to the presence or absence of the children in that mid-morning hour on August 30, 1985. *Davis,* 415 U.S. 308, 94 S.Ct. 1105. · Materiality would not be in question. *Bagley,* 473 U.S. 667, 105 S.Ct. 3375; *Agurs,* 427 U.S. 97, 96 S.Ct. 2392; Quinn, *supra,* VI Alaska L.Rev. 147. In specificity, due process generalizations from *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) should not be dispositive. Fletcher, *Pretrial Discovery in State Criminal Cases,* 12 Stan. L.Rev. 293 (1960); Developments in the Law, *Discovery,* 74 Harv.L.Rev. 940, 1051 (1961).

### IV(B). D–PASS FILES AND JUVENILE COURT RECORDS

It is not true to say as stated in majority opinion that all pre–1984 D–PASS files had been furnished to Dr. Gale. Only certain documents had been furnished. Clearly, for the period after 1984, record information which would have been informative in trial preparation was denied and complete

file material is not present here. It is also clear the files themselves show sanitation so that involvement and decisions of agencies other than D–PASS could be concealed. Generally, this category of information relates to non-activity from the first incest report of 1979 until action was finally undertaken in 1986 and then terminated in order to pursue Dr. Gale.[10]

The real issue in school, D–PASS and juvenile proceeding records is how much was the prosecution and the trial court going to protect the Rounsaville family from prosecution for perjury in trial proceedings. Directly presented are both the *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) due process and the *Brady*, 373 U.S. 83, 83 S.Ct. 1194 confirmation issues by denial of production of these kinds of records. That justification as encompassing the privacy interests of the minor victims has no weight here since what information was available had already established the general outline of the criminal misconduct of Gene Rounsaville against his children. Availability of all documentation would not invade. privacy, it could only serve to advance the search for truth in a pending criminal complaint. *Pitchess v. Superior Court of Los Angeles County*, 11 Cal.3d 531, 113 Cal. Rptr. 897, 522 P.2d 305 (1974); *People v. Crawford*, 114 Ill.App.2d 230, 252 N.E.2d 483 (1969).

Herein emerges the real problem about the in camera inspection. There has to be a limit to judicial discretion justifying ignored responsibilities to fairness and due process for the litigant. Even with the discount for the smaller base of information available to the trial judge from what is now available to this writer, there was no reasonable basis for denial of availability of these records to counsel for Dr. Gale except either knee-jerk determination to deny all discovery or, alternatively, to countenance the county officials' conduct which covered up the incestuous offenses of a father upon his young daughters. To be hidden by the conviction of Dr. Gale was the seven year course of offenses by Gene Rounsaville against those same children.

There are two attitudes about exercise of discretion for trial court in camera review. One adaptation leaves the judge to be the critical analyst in advocacy aptitude and consequently tends the decision to a denial of access to the litigant unless clear and significant justification is discerned *by the judge*. This philosophy is to be observed in plurality writing in *Ritchie*, 107 S.Ct. 989. The second, and more clearly attenuated to fairness in full fact finding and adjudicatory process, is to leave critical analysis to counsel for inspection or review unless special harm or privacy invasion without balancing benefit is evident. Denial of dis-

10. A large amount of information can be obtained from a comprehensive review of the in camera documents by comparison with what was revealed with question remaining about the "completeness" of production. It is obvious, for example, that the school district did not "create" records for documentation of sexual abuse reporting and that either their documents were destroyed or the school district had a telephone only file policy so that it could remain hidden from identification beyond its reporting responsibilities. We know that the school authorities reported, but the school records do not report that they did. It is also apparent that the decision of non-prosecution by the county attorney, not only for the incest but the sexual offenses committed on other children as well as the rape of D–17, is sanitized by non-inclusion of documents that clearly did exist before removal from the D–PASS files. Any record that would explain decisions to forego prosecution of Gene Rounsaville for sexual assault on three (or five) of his children as a seven year course of events

to chase one questionable event against the dentist, where obvious date disputes exist, is also undisclosed.

Comprehensive review of the school records provides an interesting conclusion. There is absolutely nothing provided about the school district personnel contacts with D–PASS or other public agency as showing involvement of its personnel in accord to reporting responsibilities for the Rounsaville family incest problems. D–PASS records at least show contact with school personnel, but the school provided, in the non-disclosed in camera records, no evidence of contacts and no documents.

In fairness to the trial court, present review of the total documentation, not once but at least four times, without an absolute time limitation for completion and by careful comparison of obvious trial and preliminary hearing perjury of the Rounsaville family provides a different opportunity from what was available pretrial within the in camera review.

covery about post-defense victim counseling where the defendant was the perpetrator is an example of such properly proscribed discovery.[11] In either event, in camera inspection should be a rational, realistic and fair-minded examination and analysis. Here, I would find a clear abuse of discretion lacking any persuasive reason for denial except use for trial preparation and subsequent cross-examination and with clear justification for availability in improved fact finding. Since neither defending trial counsel nor appellate counsel, if different, have ever seen the material, in camera rejection in this fashion puts a due process and fairness review totally *on the appellate opinion writers*. To require the litigant to write an appellate brief where part of the record is undisclosed creates a mockery or facade of the justice delivery system. For example, I have difficulty in believing that investigating officers in Campbell County failed to investigate where D-17 and Gene Rounsaville were on the morning of August 30. If this was not done, why not?

Finally, I am lost in the majority's discussion of this issue. Perjury was committed at trial by the Rounsaville family. Records were available to prosecution to permit defense to explore whether perjury was committed for information of the jury. Access was denied. Perjury at trial does not seem to bother the majority—it does me in moral, ethical and constitutional terms. I do not read *Ritchie* in majority disposition of its issues to promote trial conduct to the contrary or to seek countenance of perjury and particularly so when directly involved in a constitutional test of a man's reputation, career and liberty interest when infected by a sexual offense criminal conviction. Hutton, *Confrontation, Cross–Examination and Discovery: A Bright Line*

*Appears After Pennsylvania v. Ritchie*, 33 S.D.L.Rev. 437 (1988).

There is significant authority for D–PASS record disclosure which is compatible with the confidentiality provisions of W.S. 14–3–214 and its access exception in subsection (b)(vi) providing for the in camera inspection before disclosure and use.[12] The status of public assistance records in summary of reported decisions is analyzed in Reynolds, *Emerging Trends in Civil Practice: Confidentiality of Public Assistance Records*, 23 Clearinghouse Review 540 (1989):

> Briefly stated, they establish that where public assistance recipients themselves seek disclosure of their files, where the records sought are pertinent to the subject of a judicial inquiry related to the administration of the public assistance program in question, where the production request is limited and manageable in its scope, and where no compelling, countervailing interest has been demonstrated by the agency, the balance of interests mandates disclosure.

Perhaps the strongest reason for availability was stated in an early New York case which would otherwise permit the recipient to testify "and at the same time seal the lips of those who may successfully contradict them." *People v. Feuerstein*, 161 Misc. 426, 293 N.Y.S. 239, 241 (1936). See also the careful and exacting pursuit of informational release in *People v. Reidout*, 140 Misc.2d 632, 530 N.Y.S.2d 938 (1988) and *People v. Prim*, 47 A.D.2d 409, 366 N.Y.S.2d 726 (1975). Certainly, no absolute privilege is presented. *Stivahtis v. Juras*, 13 Or.App. 519, 511 P.2d 421 (1973). The rule and the policy adopted by this court in *Price ex rel. Laramie County Dept. of Public Welfare v. Pearson*, 447 P.2d 501 (Wyo.1968) is consistent with the same poli-

---

11. To be repetitive, any requests for documentation made by Dr. Gale related to offenses committed upon the Rounsaville children by their father and if any documentation relates to Dr. Gale, except a few investigative summaries, such information is not now here and remained undisclosed for the in camera inspection by the judge.

12. Privilege and confidentiality, when applied to communications or records, have been used interchangeably but have a different linguistic derivation. Confidentiality refers to the secrecy or non-public nature of the document. Privilege relates to the status of the actor as exempted, excluded or not-accountable. *See* W. Burton, Legal Thesaurus 99, 407 (1980). *Cf.* Black's Law Dictionary 269, 1077 (5th ed. 1979).

cy and process and has not been destroyed by statute or denied by court decision where this court specifically recognized the disclosure process and in camera responsibility of the trial court.

The majority also seems to say that if a defendant challenges the adequacy of the *Brady* compliance, it becomes inappropriate to strengthen the challenge by access to other documents for a demonstration of non-compliance. The majority says:

> Gale cites no authority supporting his criticism of the constitutional materiality standard as being devised to be used only in hindsight. Cf. *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494–95. Rather, like the standard applied to the prosecution in *Brady*, it appears to have been intended to focus the trial court's attention on an *in camera* search for privileged information that could change the outcome of a defendant's trial. Gale seems eager to apply this type of standard to the prosecution once he assumes they have not met their obligations under *Brady*, but he does not want the trial court to apply it to him when it reviews privileged information he speculates might be pivotal in his defense. He cannot have it both ways.

It is my persuasion that rather than an attempt of the defendant to "have it both ways," this was an effort to have access to the truth "some way." My recitation of authority in criminal prosecution need go no further than the clear text of both the United States Constitution and the Wyoming Constitution and clear principle uninterruptedly announced that conviction by perjury is unacceptable. *Napue v. People of the State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, *reh'g denied* 294 U.S. 732, 55 S.Ct. 511, 79 L.Ed. 1261 (1935); *Crawford*, 252 N.E.2d 483.

Discovery and production of the entire juvenile proceeding records addresses an even broader inquiry. I am again confused with the majority's reasoning. The basis of the requirement was to prepare to demonstrate perjury. The fact that some perjury did occur is, within this record, undeniable. The juvenile proceedings for the children and the criminal preliminary hearing proceeding for Gene Rounsaville would have provided information directly comparable to the trial testimony of those witnesses. Within the constitutional context of *Davis*, 415 U.S. 308, 94 S.Ct. 1105, no reason for denial is reflected except an adamant rejection of discovery to assist Dr. Gale's trial preparation with a consequent and perhaps unintended insulation of perjury from responsibility.[13]

---

**13.** I do not understand the majority discussion about the *existence* of juvenile court proceedings. Obviously, there were not only pleadings and file documents, a few of which found their way into this record, but transcripts of all proceedings before the trial court as required by court rules. There would also be a tape recording of the county court appearance of Gene Rounsaville at his preliminary hearing when he was initially charged with the incest-sexual abuse offenses by one or more of the children, whichever it may have been. Since existence of the seven year course of offenses is realistically unquestionable on this record, his perjury at that appearance with probably that of other members of the family, if any testified, must also exist.

We play unbecoming and avoidance games to question whether the prosecution has copies of the juvenile records, the existence of which cannot be doubted since samples are to be found in this record as witnessed by the petition, stating:

> COMES NOW * * *, Deputy Campbell County and Prosecuting Attorney, and hereby petitions and states to the court that the above named minor children are subject to the jurisdiction of this court as follows:
>
> 1. [D–17], is a minor child of the age of seventeen (17) years, having been born on August 20, 1969.
> 2. [S–11], is a minor child of the age of eleeven [sic] (11) years, having been born on April 9, 1975.
> 3. [D–10], is a minor child of the age of ten (10) years, having been born on April 5, 1976.
> 4. [D–7], is a minor child of the age of seven (7) year[s], having been born on February 2, 1979.
> 5. [D2–3], is a minor child of the age of three (3) years, having been born on June 22, 1983.
> 6. [D1–3], is a minor child of the age of three (3) years, having been born on June 22, 1983.
> 7. That the father of the minor children is Elmer Jean "Gene" Rounsaville, who resides at #12 Silver Hills, Rozet, Campbell County, Wyoming.
> 8. That the mother of the minor children is Linda Sue Rounsaville, who resides at #12

Once we have properly confined the issues for review to prosecutorial obligation to identify and consequent in camera inspection by the trial court, it would seem that *Ritchie*, 107 S.Ct. 989 is dispositive

and this court need go no further into the subject. Clearly, *Ritchie* abjures categorical motion denial without determination of what, if any, records exist and if reasonable necessity is shown, then subsequent

Silver Hills, Rozet, Campbell County, Wyoming.

9. That the minor children are currently in protective custody of the Campbell County Department of Public Assistance and Social Services in Gillette, Campbell County, Wyoming.

10. The above named minor children are subject to the jurisdiction of this court pursuant to Wyoming Statute § 14–6–203(a)(i), in that they are neglected child[ren] as defined by Wyoming Statute § 14–6–201(a)(xvi)(B), in that they have been abused by the inflicting or causing of physical or mental injury, harm or imminent danger to the physical or mental health or welfare of the children other than by accidental means, to wit: the infliction of excessive or unreasonable corporal punishment by the father, "Gene" Rounsaville; the commission of a sexual offense against one or more of the children by the father "Gene" Rounsaville, and the allowing of the commission of a sexual offense against one or more of the children by their mother, Linda Sue Rounsaville.

11. FOR PROBABLE CAUSE: On November 17, 1986, Investigator Monty Trenary, of the Campbell County Sheriff's Office and Terry Waldorf, a social worker for the Campbell County Department of Public Assistance and Social Services, met at the Rozet School to interview [D–7], a minor child, pursuant to a complaint that she had been sexually molested by her father, "Gene" Rounsaville. The minor, who is 7 years old, told Inv. Trenary and Mrs. Waldorf that her father had begun sexually molesting her when she was approximately 5 years old, and the latest incident was on or about October 28, 1986. The minor said that she had been sleeping in a room with her 11 year old brother when her father came into the bedroom and pulled down her bed covers. He then began rubbing her vaginal area for a while, and then left the bedroom. The minor was uncertain if her father placed his finger inside of her vagina, because he had touched her so much in the past she can't recall the times he did or didn't. The minor also indicated that when her father molested her in the past, he has told her that he would "kill her" if she ever told anyone. The minor's brother, [S–11], also witnessed the sexual assault on the evening of October 28, 1986.

Further investigation by Inv. Trenary and Mrs. Waldorf have revealed an extensive history of physical and sexual abuse upon the children by their father, and a passive acceptance of it by their mother. Mrs. Waldorf has obtained documented reports from the De-

partment of Public Assistance and Social Services dating back to 1980 involving excessive corporal punishment and possible sexual abuse by Mr. Rounsaville. The corporal punishment on the children has taken the form of beatings with coat hangers as well as leather straps. Additionally, Mr. Rounsaville has been known to fire weapons inside the home and was reported to have placed a gun against his wife[']s head.

[D–17], age 17, has reported an extensive history of being sexually abused by her father, beginning when she was 8 years old. [D–17] also indicated that when she was 9 years old her mother witnessed an incident of sexual molestation, but instead blamed [D–17] for it. At one point [D–17] indicated that her mother sent her to her aunt[']s home in Utah as punishment for being responsible for the sexual molestation. Upon her return, her father molested her once again. [D–17] also reported that he younger sister [D–7], age 7, had been molested by her father in early 1982. [D–17] told her mother about it at that time and her mother than [sic] confronted her father. Mr. Rounsaville admitted to having molested [D–17], but denied molesting any of the other girls or their friends. [D–17] also reported that when she was approximately 9 or 10 years of age, her father took nude photographs of her. When her mother discovered the photographs, she accused [D–17] of "being bad" and then burned the photos.

12. The above described events occurred in Campbell County, Wyoming.

13. * * * has been appointed guardian ad litem for said minor children.

WHEREFORE, your petitioner prays that [t]his matter be set for hearing and for such other proceedings as may be proper in this matter.

DATED this 18 day of November, 1986.

/s/_____
* * *

Deputy Campbell County Attorney

I, * * *, Deputy Campbell County Attorney being first duly sworn state that I am the petitioner in the foregoing matter; that I have read the foregoing petition, know and understand the contents and that the statements made therein are true.

/s/_____
* * *

Deputy Campbell County Attorney

Subscribed and sworn to before me this 18 day of November, 1986.

/s/_____

NOTARY PUBLIC

My Commission Expires: Aug. 15, 1988

submission to the trial court for in camera review.

We find that Ritchie's interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS [Children and Youth Services] files be submitted only to the trial court for *in camera* review. Although this rule denies Ritchie the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file (*e.g.*, the medical report), he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial.

*Ritchie*, 107 S.Ct. at 1003.

I perceive that this court clearly disregards the Sixth Amendment, constitutional confrontation, and the Fourteenth Amendment, due process requirement, related in *Ritchie*, 107 S.Ct. 989 and earlier addressed in *Davis*, 415 U.S. 308, 94 S.Ct. 1105. *See also Napue*, 360 U.S. 264, 79 S.Ct. 1173. The compulsory process clause compliance in criminal prosecution would also at least reach to the same juncture. *Ritchie*, 107 S.Ct. at 1001; *Bagley*, 473 U.S. 667, 105 S.Ct. 3375; *Agurs*, 427 U.S. 97, 96 S.Ct. 2392; *Brady*, 373 U.S. 83, 83 S.Ct. 1194.[14]

## V. REQUEST FOR SUMMARY OF EXPECTED EXPERT WITNESS TESTIMONY

This pervasive problem of expert witnesses in criminal litigation is summarized after an extended analysis in Myers, Bays, Becker, Berliner, Corwin, & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb.L.Rev. 1, 145 (1989):

Expert testimony plays an important role in child sexual abuse litigation. Such testimony can assist the jury in many ways. Yet, the issues raised by expert testimony are exceedingly complex, and clinical and scientific understanding of child sexual abuse is still developing. Courts should proceed cautiously when considering the admissibility of expert testimony on child sexual abuse. It is vitally important that professionals offering such testimony be highly qualified. Courts should insist on a thorough showing of expertise before permitting individuals to testify as experts. Furthermore, courts should require the proponent of expert testimony to lay a complete foundation so that the court understands precisely how the evidence is relevant. When appropriate caution is exercised, qualified experts can assist in attaining justice.

I do not accept the attitude that "what should be is however yet untimely to be" in procedural equivalency as a search for justice. The issue of this case is not whether Dr. Gale received a fair trial. No average unbiased examiner, whether learned in the law or not, would likely examine the record and find a fair result presented. The issue is whether an unconstitutionally unfair relationship for defense was created by the trial court's uniform rejection of Dr. Gale's discovery motions.

Differing from the majority, I would extend the obvious unfairness to reach a degree of prohibited unconstitutional unfairness. Denial of a summary of expected

---

**14.** The three scenario analysis of *Bagley*, 473 U.S. 667, 105 S.Ct. 3375 as directed to knowing use of perjured testimony, *Napue*, 360 U.S. 264, 79 S.Ct. 1173 and *Mooney*, 294 U.S. 103, 55 S.Ct. 340; specific request of defense and prosecutorial failure to disclose responsive evidence, *Brady*, 373 U.S. 83, 83 S.Ct. 1194; and thirdly, that defendant does not make a *Brady* request and prosecutor fails to volunteer favorable information, *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401 are only applicable here if the psychiatric or psychological records do exist and the examination of the contents by the prosecutor had occurred so that whatever relevant information might exist was consequently undisclosed. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), alien witness deportation; *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, ineffectiveness of counsel. See, however, *Giglio*, 405 U.S. 150, 92 S.Ct. 763, where false information was provided by prosecutor.

state expert witness testimony was one of the significant steps toward unfairness in contradistinction to even-handed justice.[15] First I reject the subsurface premise that justice and procedural fairness should only be available to civil litigation and the prosecutor in criminal cases. *See* Comment, *supra,* 66 Den. U.L.Rev. 123. The entire thesis of the federal rules and modernized procedures which include motion practice, pretrial and discovery was to provide equal opportunity for equivalency in knowledge before trial and a consequent rational presentation of the facts at trial. Trial by ambush and accident was to be eliminated. Reference to W.R.C.P. 1 may be urgently required. W.R.C.P. 1 states:

> These rules govern procedure in all courts of record in the State of Wyoming, in all actions, suits or proceedings of a civil nature, in all special statutory proceedings except as provided in Rule 81, and in all appeals in criminal cases. In all cases in which statutes of civil procedure are made applicable by statute to the trial of criminal cases and are not superseded by the Wyoming Rules of Criminal Procedure, these rules shall govern insofar as they supersede or are in conflict with such statutes. *They shall be construed to secure the just, speedy and inexpensive determination of every action.*

(Emphasis added.) (Originally adopted by the Wyoming Supreme Court effective December 1, 1957 or thirty-two years ago.)

Despite that noble purpose, or perhaps for criminal trials only to be a platitude, I find it terribly obnoxious that three decades and millions of nationally adjudicated cases later, we argue about what is obviously fair in exchange for summary of expected expert witness testimony. It was out of a quest for fairness to the prosecution that the alibi rules, W.R.Cr.P. 16.1 and 16.2, and reciprocal discovery provisions, W.R.Cr.P. 18(d), were created.

The decision made here cannot be defined in justification of exercised discretion unless it is said that criminal defendants should be denied rights guaranteed to civil litigants. *Smith v. Ford Motor Co.,* 626 F.2d 784 (10th Cir.1980), *cert. denied* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). Uniform Rules for the District Courts 601, pretrial practice, in part provides:

> (a) In all cases in which a pretrial conference is ordered reasonable notice of the time and place shall be given.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (c) Before pretrial counsel shall:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (4) Furnish opposing counsel names and addresses of witnesses with a summary of their expected testimony[.]

In recognizing the right to have access to the names of witnesses, this court, in *Jackson v. State,* 522 P.2d 1286, 1289 (Wyo. 1974), said:

> Counsel is not required to develop a defense for the first time upon trial, and any attorney who attempted to do so at

---

**15.** Having now read and re-read the testimony of clinical social worker Geral Blanchard as the prosecution's wind-up witness (B.A. in sociology and anthropology and a minor in psychology), I can understand the reluctance of the prosecution to provide a pretrial basis for expert witness classification and summary of testimony. It is not raised as an appellate issue, but I cannot find anything pertinent, relevant or material but a *generalized discussion clearly directed to provide an umbrella of reliability to the testimony of the children, although not so directly done as in Stephens v. State,* 774 P.2d 60 (Wyo.1989). I would challenge the entire testimony of the social worker as essentially directed to bolster credibility and provide an atmosphere of believability of guilt. *State v. York,* 564 A.2d 389 (Me.1989).

Lacking appropriate trial objection and non-inclusion as an issue on appeal, we can only fairly consider undisclosed text and consequent inadequate preparation. An in limine attack on the entire scope of testimony should have been made to directly raise the credibility bolstering character of what was then said at trial. *See York,* 564 A.2d 389. Neither caution in admissibility nor relevance in receipt is apparent here. Myers, Bays, Becker, Berliner, Corwin & Saywitz, *supra,* 68 Neb.L.Rev. 1. *Cf. State v. Person,* 20 Conn.App. 115, 564 A.2d 626 (1989), when undenied by defendant. This type of evidence is in a twilight zone where the witness should have special skill and knowledge to make their testimony information helpful to the jury.

that late stage would justifiably have his competency questioned and be open to criticism at the least. The interviewing of prospective witnesses, or any party who may have some knowledge of the subject event, is such a basic procedure in the proper preparation of either a civil or criminal case that it is axiomatic.

Discretion properly exercised involves choice within arguably appropriate alternatives. In exercise, it is not an opportunity to deny fundamental equivalency and fairness for each litigant. *Martin*, 720 P.2d 894.

There could be reasons for discretional denial of expected expert witness testimony summaries in criminal cases which should be no less nor no more than civil cases and not just because it is a criminal case. Neither litigant nor present majority cites authority or provides cogent reasoning why, as an attitude on adaptation of what is required for justice in civil litigation, it need not be provided—*as a matter of course*—in criminal cases. Casual readers of state appellate court reports cannot have any perspective to the degree that experts have invaded criminal prosecutions and particularly so, like this case, where sexual offenses are charged.[16]

To address the subject forcibly then within the rights granted by the 1957 rules of civil procedure, were rights to expert witness summary extricated or extinguished by the 1968 rules of criminal procedure? We have W.R.Cr.P. 18,[17] conjecturally W.R.Cr.P. 19 [18] and empirically W.R.Cr.P. 16.1 [19]

**16.** Excluding the one defensive effort in the abused spouse homicide cases, the use of experts in these cases are predominantly limited to prosecutorial advantage. Examination of the criminal opinions nationwide for just one week might reveal fifteen to twenty appellate reviews where use of the rape offense expert is noteworthy in discussion. Prosecution by forensic specialist is not unobserved in Wyoming. *See Brown*, 736 P.2d 1110 and *Scadden*, 732 P.2d 1036 as non-exclusive examples.

**17.** (a) *Defendant's statement; report of examinations and tests; defendant's grand jury testimony.*—Upon motion of a defendant, the court may order the attorney for the state to permit the defendant to inspect and copy or photograph any relevant:

(1) Written or recorded statements or confessions made by the defendant or copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney;

(2) Results of reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; and

(3) Recorded testimony of a defendant before a grand jury.

(b) *Other books, papers, documents, tangible objects or places.*—Upon motion of a defendant the court may order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, upon a showing of the materiality to the preparation of his de-

fense, and that the request is reasonable. Except as provided in subdivision (a)(2) this rule does not authorize the discovery or inspection of reports, memoranda or other internal governmental documents made by governmental agents in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses (other than the defendant) to governmental agents except as provided in subdivision (c) of this rule.

(c) *Demands for production of statements and reports of witnesses.*

(1) After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the state to produce any statement (as hereinafter defined) of the witness in the possession of the state which relates to subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(2) If the state claims that any statement ordered to be produced under this subdivision contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the state to deliver such statement for the inspection of the court *in camera*. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to the adjudication of the guilt of the defendant, the entire text of such statement shall be pre-

**18, 19.** See notes 18 and 19 on page 616.

Note 17—Continued

served by the state, and in event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to the defendant pursuant to this rule, the court in its discretion, upon application of the defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant in his preparation for its use in the trial.

(3) If the state elects not to comply with an order of the court under subdivision (1) or (2) hereof to deliver to the defendant any such statement or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(4) The term "statement" as used in subdivisions (1) and (2) and (3) of this rule relating to any witness called by the state, means:

(a) A written statement made by said witness and signed or otherwise adopted or approved by him; or

(b) A stenographic, mechanical, electrical or other recording or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the state and recorded contemporaneously with the making of such oral statement.

(d) *Discovery by the state.*—If the court grants relief sought by the defendant under subdivision (a)(2) or subdivision (b) of this rule, it may, on motion of the state, condition its order by requiring that the defendant permit the state to inspect and copy or photograph scientific or medical reports, books, papers, documents, tangible objects or copies or portions thereof, which the defendant intends to produce at the trial and which are within his possession, custody or control, upon a showing of materiality to the preparation of the state's case, and that the request is reasonable. Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda or other internal defense documents made by the defendant or his attorneys or agents in connection with the investigation or defense of the case, or statements made by the defendant, or by state or defense witnesses, or by prospective state or defense witnesses, to the defendant, his agents or attorneys.

(e) *Time, place and manner of discovery and inspection.*—An order of the court granting relief under this rule shall specify the time and place and manner of making the discovery and inspection permitted and may prescribe such terms and conditions as are just.

(f) *Protective orders.*—Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred, or make such other order as is appro-

priate. Upon motion by the state the court may permit the state to make such showing, in whole or in part, in the form of a written statement to be inspected by the court *in camera.* If the court enters an order granting relief following a showing *in camera,* the entire text of the statement shall be sealed and preserved in the record of the court to be made available to the appellate court in the event of an appeal by the defendant.

(g) *Time of motions.*—The motion under this rule may be made only within ten (10) days after arraignment or at such reasonable later time as the court may permit. The motion shall include all relief sought under this rule. A subsequent motion may be made only upon a showing of cause why such motion would be in the interest of justice.

(h) *Continuing duty to disclose; failure to comply.*—If subsequent to compliance with an order issued pursuant to this rule, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under the rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit discovery or inspection of materials not previously disclosed, grant a continuance or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances.

W.R.Cr.P. 18.

18. At any time after the filing of the indictment or information the court upon motion of any party or upon its own motion may order one (1) or more conferences to consider such matters as will promote a fair and expeditious trial. At the conclusion of a conference the court shall prepare and file a memorandum of the matters agreed upon. No admissions made by the defendant or his attorney at the conference shall be used against the defendant unless the admissions are reduced to writing and signed by the defendant and his attorney. This rule shall not be invoked in the case of a defendant who is not represented by counsel.

W.R.Cr.P. 19.

19. (a) *Notice by defendant.*—Upon written demand of the attorney for the state stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten (10) days, or at such different time as the court may direct, upon the attorney for the state a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses

and 16.2 [20] which are specific prosecutorial discovery rules as well as W.R.Cr.P. 17 [21]

which appears even-handedly to apply.

Note 19—Continued
of the witnesses upon whom he intends to rely to establish such alibi.

(b) *Disclosure of information and witness.*—Within ten (10) days thereafter, but in no event less than ten (10) days before trial, unless the court otherwise directs, the attorney for the state shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

(c) *Continuing duty to disclose.*—If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivision (a) or (b) the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

(d) *Failure to comply.*—Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.

(e) *Exceptions.*—For good cause shown, the court may grant an exception to any of the requirements of subdivisions (a) through (d) of this rule.

(f) *Inadmissibility of withdrawn alibi.*—Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention. W.R.Cr.P. 16.1.

**20.** (a) *Notice by defendant.*—Upon written demand of the attorney for the state, stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten (10) days, or at such different time as the court may direct, upon the attorney for the state, a written notice of his intention to offer a defense of unconsciousness, automatism, or traumatic automatism. Such notice by the defendant shall state with particularity the facts upon which the defendant relies to justify the defense of unconsciousness, automatism, or traumatic automatism and the names and addresses of the witnesses upon whom he intends to rely to establish such defense.

(b) *Examination of defendant.*—Upon the filing of such notice by the defendant, the court shall order an examination of the defendant by a designated examiner. A written report of such examination shall be filed with the clerk of court, and the report shall include detailed findings and an opinion of the examiner as to whether the accused did suffer from uncon-

sciousness, automatism, or traumatic automatism at the time of the alleged offense. The clerk of court shall deliver copies of the report to the attorney for the state and the accused or his counsel.

(c) *Disclosure of information and witness.*—Within ten (10) days after the examiner's report is served upon him, but in no event not less than ten (10) days before trial unless the court otherwise directs, the attorney for the state shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish that the defendant did not, at the time of the alleged offense, suffer from unconsciousness, automatism, or traumatic automatism and any other witnesses, to be relied upon to rebut testimony of any of the defendant's witnesses relating to such a defense.

(d) *Continuing duty to disclose.*—If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivision (a) or (b) the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

(e) *Failure to comply.*—Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defense of unconsciousness, automatism, or traumatic automatism. This rule shall not limit the right of the defendant to testify on his own behalf.

(f) *Exceptions.*—For good cause shown, the court may grant an exception to any of the requirements of subdivisions (a) through (e) of this rule.

(g) *Inadmissibility of withdrawn defense.*—Evidence of an intention to rely upon the defense of unconsciousness, automatism, or traumatic automatism later withdrawn, or of statements made in connection with such intention, is not, in any civil or criminal proceeding, admissible against the person who gave notice of the intention. W.R.Cr.P. 16.2.

**21.** (a) *When taken.*—If it appears that a prospective witness may be unable to attend or prevented from attending a trial or hearing, that his testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice, the court at any time after the filing of an indictment or information may upon motion of any party and notice to the other parties order that his testimony be taken by deposition and that any designated books, papers or documents or tangible objects, not privileged, be produced at the same time and place. If a witness is committed for failure to give bail to appear to testify at a trial or hearing, the court on written motion of the

Unfortunately in grandiose characterization in past opinions, it is said that no general constitutional right to discovery is guaranteed. But this court has never related W.R.C.P. 1 to the criminal rules to analyze due process, equal protection and proper discretion denial of rights to the criminal defendant that effectively or casually are available to the prosecutor and civil litigant. Due process cannot be properly shunted aside by ignoring the modern thesis of fact finding in modernized processes. Brennan, *supra*, 1963 Wash. U.L.Q. 279.

It is surely justified to argue in both rule requirement application and constitutional explication that the criminal defendant should have rights equal to the prosecutor and all rights of the civil litigant unless that equivalency is expressly denied by rule or statute and even then with questionable constitutional validity. How then does W.R.Cr.P. 18 deny, if it does, the right to expert witness summary which is assured by our civil rules? We are not informed by discussion in the briefs nor by citation in the majority. We are, however, directed to the proviso of subsection (b) which becomes (c) as the Jencks Act proviso. 18 U.S.C. § 3500; *Jones v. State,* 568 P.2d 837 (Wyo. 1977); *Deluna v. State,* 501 P.2d 1021 (Wyo.1972). Specifically, counsel for the State does not argue and the majority does not conclude that W.R.Cr.P. 18(c) excludes, or the exclusion of W.R.Cr.P. 18(b) includes, summaries of expert witnesses within W.R.C.P. 26(b)(1) requirements.

It is here that II ABA Standards for Criminal Justice § 11–2.1 (2d ed. 1982) follows our legal heritage found in modern rules of procedure:

(a) Upon the request of the defense, the prosecuting attorney shall disclose to defense counsel all of the material and information within the prosecutor's possession or control including but not limited to:

(i) the names and addresses of witnesses, together with their relevant written or recorded statements;

(ii) any written or recorded statements and the substance of any oral statements made by the accused or made by a codefendant;

(iii) those portions of grand jury minutes containing testimony of the accused and relevant testimony of witnesses;

witness and upon notice to the parties may direct his deposition be taken. After the deposition has been subscribed, the court may discharge the witness.

(b) *Notice of taking.*—The party at whose instance the deposition is to be taken shall give to every other party reasonable written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined. On motion of a party upon whom the notice is served, and for cause shown on notice and hearing, the court may extend or shorten the time for taking the deposition.

(c) *Defendant's counsel and payment of expenses.*—If a defendant is without counsel, the court shall advise him of his right and assign counsel to represent him unless the defendant elects to proceed without counsel or is able to obtain counsel. If it appears that a defendant cannot bear the expense of depositions, the court may direct that the expenses of travel and subsistence of the defendant's attorney for attendance at the examination shall be paid by the county. In that event the county shall make payment accordingly.

(d) *How taken.*—A deposition shall be taken in the manner provided in civil actions. The court at the request of a defendant may direct that a deposition be taken on written interrogatories in the manner provided in civil actions.

(e) *Use.*—At the trial or upon any hearing a part or all of a deposition so far as otherwise admissible under the rules of evidence, may be used if it appears: That the witness is dead; or that the witness is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or that the witness is unable to attend or testify because of sickness or infirmities; or that the party offering the deposition has been unable to procure the attendance of the witness by subpoena. A deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer all of it which is relevant to the part offered and any party may offer other parts.

(f) *Objections to admissibility.*—Objections to receiving in evidence the deposition or part thereof may be made as provided in civil actions.
W.R.Cr.P. 17.

(iv) any reports or statements made by experts in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;

(v) any books, papers, documents, photographs, tangible objects, buildings, or places which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused; and

(vi) any record of prior criminal convictions of the defendant or of any codefendant.

(b) When the information is within the prosecutor's possession or control, the prosecuting attorney shall inform defense counsel:

(i) if relevant recorded grand jury testimony has not been transcribed;

(ii) if the defendant's conversations or premises have been subjected to electronic surveillance (including wiretapping);

(iii) if the prosecutor intends to conduct scientific tests, experiments, or comparisons which may consume or destroy the subject of the test, or intends to dispose of relevant physical objects; and

(iv) if the prosecutor intends to offer (as part of the proof that the defendant committed the offense charged) evidence of other offenses.

(c) The prosecuting attorney shall disclose to defense counsel any material or information within the prosecutor's possession or control which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce the punishment of the accused.

(d) The prosecuting attorney's obligations under this standard extend to material and information in the possession or control of members of the prosecutor's staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or, with reference to the particular case, have reported to the prosecutor's office.

We need not consider the fearsome calamities of witness intimidation and contamination considered in congressional action addressing mandatory general witness listing.

*But see* 18 U.S.C. § 3432 (1976), which provides for mandatory disclosure of the prosecution witness list in capital cases "at least three entire days" before trial.

The Supreme Court proposal to amend the federal rule to include disclosure of the names and addresses of witnesses was not adopted, apparently because Congress feared witness intimidation and contamination. Conference Committee, Federal Rules of Criminal Procedure Act of 1975, H.R.Rep. No. 94–414, 94th Cong., 1st Sess. 11–12 (1975). *Compare* House Committee on the Judiciary, Federal Rules of Criminal Procedure Amendments Act, H.R.Rep. No. 94–247, 94th Cong., 1st Sess. 12, 14 (1975), *reprinted in* [1975] U.S. Code Cong. & Ad. News 674, 686.

II ABA Standards for Criminal Justice, *supra,* § 11–2.1 at 11.19 n. 17. We are only concerned in this analysis with *expert witnesses* and summaries of their anticipated forensic contribution to deliver justice to be no less fair in request by defendant as well as prosecution.

Although release of witness statements may be denied until after testimony, W.R. Cr.P. 18(c), Jencks Act—18 U.S.C. § 3500—summaries of expected expert witness testimony should be available pretrial *by application of present Wyoming rules* and by recognition of the validity of the ABA standards *unless extraordinary cause for denial* in behalf of either prosecution or defense is provided in resistance to the disclosure motion.[22]

**22.** I do not reach this prescience without walking somewhat in the watered garden of academia examination and analysis. For example, see Babcock, *supra,* 34 Stan.L.Rev. 1133; Brennan, *supra,* 1963 Wash.U.L.Q. 279; Datz, *Discovery in Criminal Procedure,* 16 U.Fla.L.Rev. 163 (1963); Fletcher, *supra,* 12 Stan.L.Rev. 293; Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure,* 69 Yale L.J. 1149 (1960); Hutton, *supra,* 33 S.D.L.Rev. 437;

## VI. NON–DISCLOSURE OF PSYCHO-LOGICAL OR PSYCHIATRIC RECORDS OF THE ROUNSAVILLE CHILDREN

None of the discovery and disclosure cases, *Bagley*, 473 U.S. 667, 105 S.Ct. 3375; *Agurs*, 427 U.S. 97, 96 S.Ct. 2392; or *Brady*, 373 U.S. 83, 83 S.Ct. 1194, can be applied to justify the preliminary denials presented on this medical record issue. Defendant's counsel can only find out what exists by asking, which was done in *Bagley*, 473 U.S. 667, 105 S.Ct. 3375.[23] Since we are left to conjecture when the initial issue of disclosure of existence is not considered, for relevancy we are lead by stage skipping to in camera inspection examination by litigant request and finally trial evidence utilization which are the subjects addressed in briefing and majority opinion. The disclosure requirements of *Ritchie*, 107 S.Ct. 989; *Bagley*, 473 U.S. 667, 105 S.Ct. 3375; and *Brady*, 373 U.S. 83, 83 S.Ct. 1194 as well as equal protection due process requirements of Wyo. Const. art. 1, § 6; art. 1, § 10; and art. 1, § 34 should serve to resolve constitutional denial from the criminally charged defendant of excul-

Krantz, *Pretrial Discovery in Criminal Cases: A Necessity for Fair and Impartial Justice,* 42 Neb. L.Rev. 127 (1962); Louisell, *The Theory of Criminal Discovery and the Practice of Criminal Law,* 14 Vand.L.Rev. 921 (1961); Louisell, *Criminal Discovery: Dilemma Real or Apparent?,* 49 Calif. L.Rev. 56 (1961); Moran, *Federal Criminal Rules Changes: Aid or Illusion for the Indigent Defendant?,* 51 A.B.A.J. 64 (1965); Quinn, *supra,* VI Alaska L.Rev. 147; Rezneck, *The New Federal Rules of Criminal Procedure,* 54 Geo.L.J. 1276 (1966); Traynor, *Ground Lost and Found in Criminal Discovery,* 39 N.Y.U.L.Rev. 228 (1964); Zagel & Carr, *State Criminal Discovery and the New Illinois Rules,* 1971 U.Ill.L.F. 557 (1971); Comment, *supra,* 66 Den.U.L.Rev. 123; and Developments in the Law, *supra,* 74 Harv.L.Rev. 940. *See also* Bibliography, *Criminal Discovery,* 5 Tulsa L.J. 207 (1968).

**23.** It is not completely accurate to say that no known psychological records existed. A preliminary hearing was held where Dr. Gale subpoenaed Dr. Heineke (preliminary motion hearing) for a decision on production of his reports and test results in the Northern Wyoming Mental Health Center as a staff psychologist. Whatever may have been included in his records relating to the Rounsaville children came from juvenile proceedings adjunct to the criminal proceedings which had been instituted against the father and this file was neither reviewed by the trial court nor made available to Dr. Gale. The final decision made in the production hearing by the trial court was to delay decision on those records and then in final decision and opinion letter, it was held that Dr. Gale had not shown any psychiatric investigation or records existed. No witness for the mental health center was called to testify at trial and whatever records may have existed remained undisclosed by action of the trial court in denying consideration of juvenile court records by discovery motion of Dr. Gale. In initial motion, the request was for the prosecutor to *disclose and make available for inspection.* Subsequently, Dr. Heineke was subpoenaed for the motion hearing. The State never responded as to whether or not any other examination records were known to exist. Juvenile record production when denied resulted in the concurrent denial of access to any records of the mental health center and none of these records were considered in camera or otherwise by the trial court. Actually, since the decision was deferred by the trial court and consequent discovery of the mental health center records denied nothing was really determined about what records existed or what periods were involved except that in context, it was clear that the records were the result of juvenile proceedings which were the result of the recognized incest offenses committed upon the Rounsaville children by their father.

In the presentation of the State and decision of this court, no citation of authority or discussion is directly presented about discoverability *of the existence of medical reports and their availability* as differentiated from examination after existence is disclosed.

The privilege of these records in either constitutional or statutory terms is certainly indeterminate. In addition to constitutional considerations presented by both the United States and Wyoming constitutions, we have W.R.E. 501 constituting a rule of evidence for asserted privilege.

W.R.E. 501 adopted the common law foundation of the federal rules for privilege. Emplaced in statutes are a psychologist privilege statute, W.S. 33–27–103, a lawyer and physician privilege statute, W.S. 1–12–101(a)(i), and crisis center advocacy privilege statutes, W.S. 1–12–116 and 14–3–210. W.S. 14–3–210 states:

(a) Evidence regarding a child in any judicial proceeding resulting from a report made pursuant to W.S. 14–3–201 through 14–3–215 shall not be excluded on the ground it constitutes a privileged communication:

(i) Between husband and wife;

(ii) Claimed under any provision of law other than W.S. 1–12–101(a)(i) and (ii); or

(iii) Claimed pursuant to W.S. 1–12–116.

This court considered these statutes in determining that privilege was limited in all cases by the text of W.S. 14–3–210. *Matter of Parental Rights of PP,* 648 P.2d 512 (Wyo.1982).

patory file information, including existence of medical reports.

A broad collection of cases has been cited about constitutional rights to discovery, privilege, relevance and materiality, but none address the question faced here. That question is whether the prosecution should be required to reveal if any medical reports exist and what they are so that usage can be considered by defendant in order to request in camera inspection by the trial court. *Cf. State v. Trammell,* 231 Neb. 137, 435 N.W.2d 197 (1989). Confrontation under the Sixth Amendment cannot come into analysis until it is first established whether there is anything to be considered. *See Ritchie,* 107 S.Ct. at 1002, which said:

> Ritchie is entitled to have the CYS [Children and Youth Services] file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial. If it does, he must be given a new trial. If the records maintained by CYS contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction.

In the context of that case, I find a due process issue and wonder repeatedly whether due process in Wyoming is empirically confined to practice in civil litigation only. *Bond v. District Court In and For Denver County,* 682 P.2d 33 (Colo.1984).

Discussion of this travesty in adjudicatory due process at times approaches the achievement of swatting flies with a piece of wet tissue paper. The goal of review escapes significant consideration by perambulating nonsense. *Cf. State v. Bruno,* 197 Conn. 326, 497 A.2d 758 (1985), *cert. denied* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). Pages of discussion appear in the State's brief and references in the majority directed to the question of Dr. Gale's proof that the psychiatric records for the Rounsaville children may not exist or are not demonstrated to exist. Having been denied access to the information required to determine what records exist, the controversy is then answered

that no rights exist because proof of the existence of the records has not been provided by the party to whom disclosure has not been made. This is adjudicatory nonsense and sheer lunacy along with wasted time. If the records do not exist or were unknown to prosecution, why should we waste taxpayer's resources determining the hypothetical question about what we might do if there is something with which we might have available to do it. In context at this stage and particularly since none of the in camera records or tendered documentation establishes anything about what may exist as psychiatric or psychological records which were developed before or after the 1986 event, we reach not much further in conjecture than re-examining the ancient history inquiry of how many angels can dance on the head of a pin.

There is nothing in all of this to reasonably demonstrate beyond whatever test of inquiry whether certain other records *may exist* to determine *if they do exist* and, if so, *where.* Dr. Gale concluded in his brief:

> In summary, this court should find that under certain circumstances the confidentiality that attaches to psychiatric records must yield to a criminal defendant's rights to due process, confrontation, and compulsory process * * * to both the United States and Wyoming constitutions. Furthermore, under the circumstances of this case good cause had been shown to justify a disclosure of the requested records. Hence, the trial court erred in not ordering the records to be produced and disclosing them to the defense or at least reviewing them in camera.

The State responded:

> If Appellant believed that the existence of such records had been established, he certainly had the opportunity to so inform the court. Before trial began, defense counsel made specific inquiries regarding some of the court's rulings or apparent lack of rulings, yet took no exception to the black and white statement of the court that no psychiatric records had been shown to exist. Counsel did not avail himself of the court's

willingness to conduct an in camera review of such material. * * *

* * * * * *

When the balancing test of *Davis* and *Ritchie* is applied, the victims' significant privacy interest in psychiatric records, and the State's compelling interest in maintaining confidentiality, outweighed Appellant's interest *in this setting.* Even if Appellant had shown to the trial court that psychiatric records existed, there should have been no in camera review.

(Emphasis in original.) This court confuses:

At the motions hearing, the trial court addressed the subpoena duces tecum issued to Dr. Heinecke and concluded that because any examinations or treatment Dr. Heinecke might have conducted with the R children were pursuant to the earlier juvenile court proceedings, their availability to the defense would be decided under Gale's motion for release of the juvenile court records. * * *

* * * * * *

Gale has never put forth any additional evidence showing that such records exist, let alone establish some basis for a claim that such records might contain information constitutionally material to his defense. * * * The district court did all that it could do. It gave Gale an open invitation to present evidence establishing the existence of psychological records not a part of the juvenile court file and information within such records that might be constitutionally material to his defense. Gale never took advantage of the district court's offer; consequently, he has not fulfilled his burden to present this court with a record that *would afford him* appellate review on this issue.

It is intrinsic to this discussion that no challenge is made to in camera inspection. Not only to be applied to medical resources, but this *Ritchie,* 107 S.Ct. 989 adaptation is surely appropriate for other private documentation consideration. Hutton, *supra,* 33 S.D.L. Rev. 437. Proper in camera examination first enjoins a competitive unequivalency against the flexible and energized defense attorney and secondly reserves confidential information from the semi-public scrutiny of litigant counsel where no merit or relevancy to the issues at hand are demonstrable. At the same time, the proper in camera examination requires study by the trial court of a character to be expected from the energized and imaginative trial counsel. Detective work examination in trial preparation is the hallmark of the superior litigator and the obligation and opportunity of trial court in in camera examination is to recognize leads and not always admissible evidence as a high challenge in trial preparation. It is to be recognized as a responsibility of in camera examination that the trial court cannot see the moon if the examiner is only looking for the sun. Likewise, what is significant to portray and develop veracity and validity is a complex of interrelated stimuli developed by the rational application of reasoning and review.

Consequently, in camera examination appropriately approached should not make the trial judge a soothsayer or adjunct to either or both trial counsel. *In camera is only directed to exclude from review and evaluation by counsel what is unnecessarily harmful to the subject of the records.* Otherwise, the thoughtful scrutiny should be done by counsel and not anticipated by exercised responsibility of the trial court.

There is nothing in this record, provided by the State or the State's witnesses, which establishes that there are no psychological or psychiatric records. The involvement of Dr. Heineke, referenced in the majority opinion, and modest knowledge of responsibility of professional health care personnel for maintenance, preparation and preservation of defined records suggests a probability. The trial court could and should have required the prosecution to state what, if any, records were known to exist, of where, whom and what and then pursued argument whether contents would be reviewed in camera and, if not, at least consideration and text would be available for review *in this record.* Consequently, in

assuming something existed that prosecutor, public institutions and, in result, even the trial court desired to immunize from review involving either the offenses committed against the Rounsaville children or the doubt of guilt of Dr. Gale for his charged offense, I will not pursue this subject generally except to demonstrate that existence and identification should have been required. Thereafter, in camera examination should have been pursued by a realistic trial court review.[24]

I can only properly examine the authorities to review precedent as to whether the availability of records should have been identified to permit the course of requested discovery to the stage at least of in camera examination by the trial court. Anything less makes the entire review meaningless. Anything more renders discussion ephemeral and also hypothetical.

Cited case authority does not demonstrate a logical and persuasive basis for affirming what the majority does here. *State v. Esposito*, 192 Conn. 166, 471 A.2d 949 (1984) recognized the constitutional confrontation interest and consequent effectuation where appropriate by striking the testimony of the witness if the privilege was not waived. The case was decided on the failure of proof for defendant to demonstrate any mental problem of the witness which affected her testimonial capacity as a threshold "relevancy" requirement by stating that "[w]e are not inclined to conjure up a picture of mental abnormality out of nothing more substantial than the defendant's gossamer illusions." *Id.*, 471 A.2d at 957. *Com. v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120 (1987), *appeal denied* 518 Pa. 617, 541 A.2d 744 (1988) was both factually

and substantively different as involving post-offense treatment. Similarly, see *People v. District Court In and For City and County of Denver*, 719 P.2d 722 (Colo. 1986) and *People v. Foggy*, 121 Ill.2d 337, 118 Ill.Dec. 18, 521 N.E.2d 86, *cert. denied* 486 U.S. 1047, 108 S.Ct. 2044, 100 L.Ed.2d 628 (1988). *State v. Cusick*, 219 N.J.Super. 452, 530 A.2d 806 (1987) provides little converse authority, if any, since the trial court did make an in camera inspection and a specific finding that there was no necessity to disclose since "almost all of the information that is in those reports is obtainable and can be obtainable from other sources." *Id.* at 809. *Cusick* is to be compared with *People v. Reber*, 177 Cal.App.3d 523, 223 Cal.Rptr. 139, 146 (1986) for failure to make a proper in camera inspection and was found to constitute error where, as stated by the frequently cited decision, it was stated:

> Accordingly, the trial court erred to the extent it failed to (1) obtain and examine *in camera* all the materials under subpoena, (2) weigh defendants' constitutionally based claim of need against the statutory privilege invoked by the People, (3) determine which privileged matters, if any, were essential to the vindication of defendants' rights of confrontation and (4) create a record adequate to review its ruling.

*See also People v. Pack*, 194 Cal.App.3d 1512, 240 Cal.Rptr. 367 (1987).

*Bobo v. State*, 256 Ga. 357, 349 S.E.2d 690 (1986) also affords no support on the issue presented since the subject of the proposed testimony was made available and an inadequate showing of necessity for

---

**24.** What this means is that the whole arena of privilege, admissibility, proper trial preparation, discovery, confrontation and impeachment is solely ephemeral and hypothetical as to lack any justification for scrutiny *in this case* as now presented. On those subjects not now addressed, see *Trammell*, 435 N.W.2d at 200. *See also Boutwell*, 558 A.2d at 249 and *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854, 870 (1989).

If there is anything rational to what the trial court did in denial of obligation to state what might exist and the continued inadequacy of the State in appellate brief as well as the distended

discourse of the majority, it would be that any simple assertion of non-existence of information and records of psychological or psychiatric examination of the Rounsaville children is not credible. Consequently, I assume such documentation did exist, but remains undisclosed and approach the burden of this issue in appellate discussion to consider a denial of access to Dr. Gale for his defense within these facts of a near decade of sexual abuse of the same children by their father, after which a non-prosecution arrangement absolved the father from his course of criminal behavior.

the trial testimony denied its use for witness impeachment. It is apparent the courts have been particularly protective of post-event victim counseling assistance in this regard. *District Court In and For City and County of Denver*, 719 P.2d 722; *Esposito*, 471 A.2d 949; and *Foggy*, 521 N.E.2d 86 are identical and distinguishable.[25] If it is to be considered that the United States Constitution in the most recent due process inspection on the subject in *Ritchie*, 107 S.Ct. 989 is not decisive, the foundational case in philosophy is *In re Zuniga*, 714 F.2d 632 (6th Cir.), *cert. denied* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983), which addressed identification and dates of treatment. The court recognized:

> Clearly then, the Court has the authority to recognize a psychiatrist-patient privilege. This authority must be exercised with caution. As the Supreme Court has noted "[e]videntiary privileges in litigation are not favored." *Herbert v. Lando*, 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979), and "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth." *United States v.*

*Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974).

\* \* \* \* \* \*

Having recognized the compelling necessity for the privilege, it remains for the Court to determine its applicability to the instant action. It should be emphasized in this regard that no attempt is made here to define the appropriate perimeters of the privilege. Just as the recognition of privileges must be undertaken on a case-by-case basis, so too must the scope of the privilege be considered. *See, Upjohn Co. v. United States*, 449 U.S. 383, 396–97, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981). This is necessarily so because the appropriate scope of a privilege, like the propriety of the privilege itself, is determined by balancing the interests protected by shielding the evidence sought with those advanced by disclosure.

*Id.* at 637–40.

Clearly in constitutional context, the denial of evidence availability by privilege is not absolute. In *United States v. Lindstrom*, 698 F.2d 1154, 1166 (11th Cir.1983), the court said "[w]hen balanced against the great probative weight of the psychiatric records for the issues in this case, the

---

**25.** The general subject of testimony privilege is discussed in Developments in the Law, *Privileged Communications*, 98 Harv.L.Rev. 1450 (1985), as the entire study in introduction by quotes may be prophetic or self-contradictory. " 'Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.' " *Id.* at 1450 (quoting *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). And, in conclusion, undefinable:

> As the preceding Parts demonstrate, the law of privilege defies any single, unifying principle or justification. This conclusion is hardly surprising; privileges cut across all classes of society and all manner of relationships, and raise "issues that lie at the center of the contemporary debate about the foundations of liberal society." In the ten years that have passed since the enactment of the Federal Rules of Evidence, the law of privilege has continued to exhibit the complexity and power of the underlying social forces that combined to eliminate specific privilege provisions from those rules. Few, if any, areas of evidence law raise such fundamental dilem-

mas and result in such controversial outcomes.

> Nonetheless, some broad principles do emerge. Both camps in the privilege debate are hampered by empirical uncertainty. One can never prove that costs outweigh benefits or vice-versa with regard to a particular privilege: such arguments inevitably degenerate into simple unsupported assertions. The debate must instead focus on the values that society seeks to protect in a particular area or particular relationship. Once these values are identified, the evaluation of the privilege must rest not merely on an attempted cost-benefit analysis, but also on considerations of personal privacy and the social acceptability of a legal system that intrudes into particular areas.

> The law of privilege is likely to continue to thrive, unstable as its justifications may be. Social realities require that some balance be found between the forces of truth-seeking and privacy.

Developments in the Law, *supra,* 98 Harv.L.Rev. at 1665–66 (footnote omitted and quoting Levinson, *Testimonial Privileges and the Preferences of Friendship,* 1984 Duke L.J. 631, 662 (1984)).

district court's justifications of cumulativeness and remoteness are insubstantial." *See also United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461 (4th Cir.1979), *cert. denied sub nom. Kayo Oil Co. v. United States*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981).

In analysis, we properly consider McCormick on Evidence § 105 at 259 (3d ed.1984) (footnote omitted) as the sweeping curtain of privilege accomplishing

> the complete failure to consider the other side of the shield, namely, the loss which comes from depriving the courts of any reliable source of facts necessary for the right decision of cases.

\* \* \* \* \* \*

Some of the analytical weaknesses of the utilitarian rationale of the privilege, except in the psychotherapeutic context, have been noted earlier. To these must be added the perplexities and confusions arising from judicial and legislative attempts to render tolerable a rule which essentially runs against the grain of justice, truth, and fair dealing. The uncertainties of application of a privilege so extensively and variously qualified and restricted should suffice conclusively to rebut any continuing effort to justify it on utilitarian grounds, for no one familiar with the vagaries of its operation will

be disposed to repose confidence in its protection. Those not so knowledgeable will often find it a snare and a delusion.[26]

Additional authority for error in denied identification of the existence of the medical records and in camera inspection by the trial court as relevant to this factual relationship is included in the discussion of the Georgia court in *Bobo*, 349 S.E.2d 690. The function of trial preparation and presentation is uniquely different here than is illustrated by that opinion in order to justify the veil of the non-removal privilege. In the broad due process context, we are faced with pretrial events which "undercut the right of cross-examination" and are then the essence of confrontation. *Ritchie*, 107 S.Ct. at 1008, Brennan, J., dissenting. We cannot know here whether the medical record file "contains information that may have changed the outcome of [the] trial had it been disclosed," *Id.* at 1004, and even to meet the Blackmun special concurrence test:

> In my view, there might well be a confrontation violation if, as here, a defendant is denied pretrial access to information that would make possible effective cross-examination of a crucial prosecution witness.

*Id.* at 1004.[27] The difference in advantage to the prosecution for the opportunity to

---

**26.** It is undisputed in factual record that any analysis of case law about medical treatment programs of the Rounsaville children and any medical records or documentation results from the sexual abuse of those children by Gene Rounsaville and not Dr. Gale. It is the context of prosecutorial absolution of principle miscreant and arguable redirection of the criminal application to the bystander where here, discovery, *Brady* information and medical record production assume case relevance and singular significance. *Com. v. Lloyd*, 567 A.2d 1357 (Pa. 1989).

**27.** It is obvious that the anticipation of the authorities and text writers of two decades ago were unusually wrong and completely optimistic that their principles would be accepted in order for criminal defendants to have the same rights and protection as all litigants in civil cases and the prosecution in criminal cases. "In any event it seems inevitable that criminal discovery, which has seen significant expansion in recent years, will continue to develop in the

future." Note, *Criminal Discovery—The State of The Law*, 6 Utah L.Rev. 531, 545 (1959). "It becomes readily apparent that the accused in the criminal case does not have rights equal to those of a defendant in a civil case, and by no means can he be considered \* \* \* to have equal rights with the prosecution." Datz, *supra n. 22*, 16 U.Fla.L.Rev. at 165.

> Discovery is a bad word to devotees of the old-time theater of hide-and-go-seek. It is time to ask whether the element of surprise they set such store by is not one of the most overrated elements in the judicial process. It is one thing to acknowledge its usefulness in testing credibility, but quite another to glorify it as the keystone of the adversary system. If it were indeed the keystone, the arch would in truth be fallen. The truth is most likely to emerge when each side seeks to take the other by reason rather than by surprise. The more open the process for eliciting it, the less need there is of surprise.

Traynor, *supra n. 22*, 39 N.Y.U.L.Rev. at 249. *See* Goldstein, *supra n. 22*, 69 Yale L.J. at 1172

convict and fairness to each contestant to advance fact finding for justice should not be ignored. *See* II ABA Standards for Criminal Justice, *supra,* §§ 11–1.1, 11–2.1, 11–2.2, 11–2.3 and 11–2.4 as well as the countervailing disclosure to prosecution.

At issue is the fundamental fairness that must be the touchstone of all judicial inquiry. *See State v. McBride,* 213 N.J.Super. 255, 517 A.2d 152 (1986), where at least an in camera review should have been made to determine whether the report or any part thereof was discoverable. *See also Greene v. Wainwright,* 634 F.2d 272 (5th Cir.1981) and *United States v. Partin,* 493 F.2d 750 (5th Cir.1974). In even more recent review, the subject of use and availability of medical records is comprehensively addressed in *Com. v. Lloyd,* 567 A.2d 1357 (Pa.1989).

In criminal analysis, in following both *Ritchie,* 107 S.Ct. 989 and *Reber,* 223 Cal. Rptr. 139, the case of *People v. Caplan,* 193 Cal.App.3d 543, 238 Cal.Rptr. 478, 486– 87 (1987) is both adaptive and persuasive, where the court enunciated that

> constitutional due process, and not the right to confrontation, compels the People to turn over evidence in its possession pretrial that is both favorable to the accused and material to guilt or punishment. Both cases set out procedures for the trial court to follow for *in camera* review of the sought-after material.

The trial court here did not review the records, notes or files of Dr. Brennan subpoenaed by Caplan and argued by Caplan to be necessary for the preparation and presentation of his defense. The court merely upheld Cindy's privilege not to allow any disclosures. Therefore, the court again erred.

Preclusive authority which would even require a different result for confrontation and due process rights under the Wyoming constitution which would be less protective than the United States Constitution is not authenticated by briefing or statement of cases in the majority opinion. Additionally, the Wyoming Constitution need not be limited in its protective right for Wyoming

citizens by national concepts of a different court derived from a different document. *Jones,* 568 P.2d 837 did not provide a definable answer since their lists of witnesses were provided by each side and that production was not an issue as the Jencks Act statement review W.R.Cr.P. 18(c)(1) and (3) was not adapted since never reached. Consideration of materiality is intrinsic to the lack of identification from which any conclusion could be drafted. The manufactured evidence issue of *Wilde v. State,* 706 P.2d 251 (Wyo.1985) is likewise absent since the records and documentation would generally be within the custody of other agencies and instrumentalities as a product of juvenile court proceedings. The broad conception that the trial court has discretion in determining the requirements of adherence to pretrial and discovery orders in civil cases lacks application here where, in a civil case in Wyoming, an enforceable right to lists of expected witnesses is mandated by rules and general practice. *See State v. Dieringer,* 708 P.2d 1 (Wyo.1985). *Aguilar v. State,* 764 P.2d 684 (Wyo.1988) provides no additional weight in consideration of the confused record and trial facts that the document was available for cross-examination and only admissibility as an exhibit was an issue. The document had been furnished and its use for impeachment is not deterred. Privilege is no more appropriate when used to insulate the complainant from questions of perjured testimony than is the case for the civil litigation plaintiff where waiver is implied. The same balance should be applied. *Bond,* 682 P.2d 33. The dicta of the "non-discovery" Wyoming cases is outdated and contrary to both modern precepts of due process and our present rules of procedure. I find no basis in those cases to countenance perjury or deny adequate trial preparation. *Fitzgerald v. State,* 601 P.2d 1015 (Wyo.1979); *Dodge v. State,* 562 P.2d 303 (Wyo.1977); *Coca v. State,* 423 P.2d 382 (Wyo.1967). Compare the hypnosis cases and duty to reveal in *Gee v. State,* 662 P.2d 103 (Wyo.1983) and *Chapman v. State,* 638 P.2d 1280 (Wyo.1982).

and Y. Kamisar, W. LaFave & J. Israel, *Modern Criminal Procedure* ch. 20 at 1147 (5th ed. 1980).

In sum, neither the Constitution of the United States, the Constitution of the State of Wyoming nor the precedential case law serves to justify the due process denial of documentary identification and consequent in camera inspection for prejudice, materiality and factual content relatable to accusatory witnesses for their defense of their father and substantive prosecution of the bystander.

## VII. THE JUVENILE PROCEEDING "IMMUNITY" AGREEMENT

Differing from the majority, my conscience is shocked by this saga of family incest and the public official's failure to effectively act to protect the children from their father except by an immunity agreement for the father and mother. This is perjury, bought and paid for. This case, within an augmented record which is disclosed in in camera documents and much more that is not disclosed and consequently unknown except to prosecution and the perpetrators, swims with both incestuous sexual abuse and trial time perjury. This is not a bald assertion from which real inference cannot be drawn. It commences in 1979 by entry in D–PASS records form SS–219 dated July 23, 1979 under the caption of D–17, a fourth grader, involving child protection with the statement made, "complaint lodged by school nurse on last day of school. Since I was out of town and didn't have enough info. to follow up on the complaint, I've tabled it until Sept. School will check on it for us then. This should be logged as an I & R for future reference." This was then followed by a June 4, 1980, D–PASS form SS–219, captioned Gene Rounsaville, with comments:

S.O. [school office] reported alleged sexual molestation by Gene of [D–17] and two of her friends at a slumber party. S.O. attempted to investigate, but initial efforts failed to turn anything more up. It is turned back to us for investigation.

A conference was held involving Gene Rounsaville, Linda Rounsaville and D–PASS personnel to be followed by reports in late 1980, 1981, and other documentation which reveals that the evil continued uncor-

rected as to D–17 and the other children until the first real investigative action in 1984 when legal action was then reviewed but not instituted until two years later. One does not need to be totally informed in methodology of record preparation by D–PASS offices to discern quickly that the in camera file has been sanitized by someone or only partly collected. It would appear that party interview records and reports are generally not included. What did occur was that D–PASS forms were extracted and other detail and documentation material were only partially made available even to the trial court. This status of questionably incomplete records provides little confidence in the delivery of the justice system in its operation regarding the Rounsaville family.

Everyone involved, including specifically the trial court, knew from examination of this record that preliminary hearings and juvenile court proceedings had occurred and records existed. Besides actual knowledge, judicial notice is not unknown in Campbell County. Obviously, either the documents were not examined in camera or this record is incomplete because complete files are not included.

To make clear what samples are available to authenticate evidence of the proceedings, the record reveals:

Criminal Complaints dated March 17, 1986, 86–CR–88–13 and 86–7128 against Gene Rounsaville by deputy sheriff, Monty Trenary, sexual assault on D–7. Two juvenile court admission agreements, *In the Interest of: Rounsaville Children,* Juvenile Nos. 1029, 1032, 1033, 1034, 1035, 1036, filed January 16, 1987, signed by Linda Rounsaville with the second being signed by Gene Rounsaville.

Juvenile petition entitled *In the Interest of D–17, S–11, D–10, D–7, D1–3, and D2–3* dated November 18, 1986.

Transcript of the examination of the assistant prosecuting attorney taken April 24, 1987, discussing both juvenile proceedings and criminal proceedings against Gene Rounsaville.

Dr. Gale's exhibit list indicates:

All preliminary hearing exhibits in the matter of *State v. Gale* and *State v. Elmer Jean Rounsaville* (these documents were never made available by prosecution for trial introduction by Dr. Gale).

In camera documents. *In the Interest of D–17, S–11, D–10, D–7, D1–3 and D2–3,* order for shelter care filed December 1, 1986.

Notice of setting entitled *In the Interest of [the Rounsaville Children],* hearing scheduled April 22, 1987 (dispositional hearing).

*In the Interest of D–17, S–11, D–10, D–7, D1–3 and D2–3,* order to appear filed November 18, 1986.

## VIII. MOTION TO DISMISS OR SUPPRESS TESTIMONY

Analysis of this issue requires framing the denial of discovery for review within a landscape clearly established by trial testimony of unrequited perjury by most, if not all, of the Rounsaville family. It may be arguable when the prosecution first knew about the full scope of "discrepancies" until during trial when it became obvious that one critical facet could not have happened—the morning after conference, which was intrinsic to the testimony of all of the witnesses. The prosecution, from even the minimal records available, many of which were not available for defense, knew or should have known that both Gene and Linda Rounsaville never testified truthfully about the seven year scope of incest occurrences. It is curious that office correspondence to D–PASS about non-prosecution cannot be found. Intrinsic to the status of anticipated perjurious testimony at trial was the non-prosecution agreements which were executed. I do not write about bald assertion. Examination reveals minimized record production and examination

reveals events and circumstances authenticated from the records which were only made available for in camera inspection and never given to counsel. This does not meet a due process test. Louisell, *Criminal Discovery: Dilemma Real or Apparent?,* 49 Calif.L.Rev. 56 (1961); Louisell, *The Theory of Criminal Discovery and the Practice of Criminal Law,* 14 Vand.L. Rev. 921 (1961).

## IX. UNAVAILABLE EVIDENCE

As almost a post-script, we are faced with an argument about non-use by investigators, police and D–PASS of recordings for interviews with members of the Rounsaville family or, for that matter, other knowledgeable witnesses which could have included the classmate guests who were also members of the 1980 sexual offense by Gene Rounsaville at the slumber party. Obviously, if nothing was recorded, nothing can be produced. I reject implicitly and explicitly the broad absolution of this majority that investigating officers do not, at least under the Wyoming Constitution, have a participative responsibility to provide due process in the investigation of a person to be charged with a crime. *People v. Pope,* 724 P.2d 1323 (Colo.1986). I do not excuse apparent negligence to necessarily deny violation of the defendant's right to due process of law. *State v. Leslie,* 147 Ariz. 38, 708 P.2d 719 (1985). This court serves to assure due process and justice and not just to explain how a questionable conviction can be justified by excuses for affirmation. Neither *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), *reh'g denied* —— U.S. ——, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989) nor other recent United States Supreme Court decisions serve to repeal the Wyoming Constitution or to justify the decision presented here.[28] Although different as

---

**28.** It is not the conclusion of my exacting file review that Dr. Gale is determinably innocent of some kind of misconduct involving the Rounsaville children at another time. I would see within a degree of probability as far less certain than a reasonable doubt that if anything ever occurred, it did not occur in the fall of 1985, namely on August 30, in the early morning

hours. The tie-in factors of empirical probability upon which decision can rationally be made rejects that date for occurrence. Consequently, we are led to reason that if something ever did happen, it was six months earlier and this scenario of prosecution was wholly concocted by the Rounsaville family to deter prosecution of the father and his resulting incarceration which

relating to interrogation of a suspect instead of the complainants, I would follow the due process ideal of *Stephan v. State*, 711 P.2d 1156 (Alaska 1985) and not the legislature's approval of *People v. Everette*, 187 Ill.App.3d 1063, 135 Ill.Dec. 472, 543 N.E.2d 1040 (1989) and *State v. Gorton*, 149 Vt. 602, 548 A.2d 419 (1988). To record is to preserve for future certainty. *Stephan*, 711 P.2d 1156. The problem in this case was magnified since not only was documentary evidence not available to the defense, but the record reflects an active program in school and D–PASS to assure

non-availability of witnesses for interviews by representatives of Dr. Gale for his trial preparation. The State should not have denied access to witnesses. *Sosebee v. State*, 190 Ga.App. 746, 380 S.E.2d 464, *cert. denied* —— U.S. ——, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989).

## X. CONCLUSION

Due process, equal protection and fairness have not been served in this proceeding which ended with conviction. Consequently, I dissent.

---

factually was what happened. Among other aspects of the testimony, there are too many basic tests of evidence which relate to a winter time and not late summer occurrence, including Dr. Gale's testimony. In review of all available documentation in these files, I do not find reasonable doubt, I find probable innocence.

APPENDIX

D-17 and D-10
in bed in this room

Mother in this room

D1-3 and D2-3 in this room

D-7 in bed in this
room

Television

Father sitting in chair

S-11 in separate bed
in this room

Fireplace

Information added to exhibit
for present information is
underlined.

URBIGKIT, Justice, dissenting from the rehearing denial.

Gale requests a rehearing based in particular on *Zabel v. State,* 765 P.2d 357 (Wyo.1988) which was rendered by this court after original appellate briefs were filed here. Although I would agree with appellant that *Zabel* was misplaced in majority opinion to justify rejection of the *Ballard v. Superior Court of San Diego County,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838 (1966) and *People v. Russel,* 69 Cal.2d 187, 70 Cal.Rptr. 210, 443 P.2d 794, *cert. denied* 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968) rationales for psychiatric examination, the repeated mistake now made by the majority is incomprehensively more severe where *Zabel* precedentially addresses the Gale trial introduction of totally inappropriate testimony of a clinical social worker. The testimony of that witness, Geral Blanchard, as the wind-up performer for the prosecution is explicitly inadmissible under *Zabel,* although arguably not reversible under earlier Wyoming case law including *Brown v. State,* 736 P.2d 1110 (Wyo.1987), Urbigkit, J., dissenting.

The plain error found in *Zabel* should equally provide plain error now clearly authenticated from the trial of Richard Gale. Although appellant did not earlier include this contention, lacking the prescience to anticipate a decision such as *Zabel,* the wrongfulness of admitting the testimony of the social worker was not unnoticed by this writer with reflective time to review for dissent. *See* page 614 n. 15, Urbigkit, J., dissenting.

This court, to provide fairness and constitutional due process, should grant the rehearing in the interest of simple justice in behalf of an accused, who in my opinion is probably innocent, by recognition that *Zabel* in itself should mandate reconsideration for rehearing and reargument. The exhaustive and persuasive differentiation between testimony which is admissible as rape trauma syndrome evidence and non-admissible as proof of occurrence evidence decisively delineated in *People v. Taylor,* 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131 (1990) should buttress our decision as the *Zabel* standard of Wyoming law and now require a rehearing for Gale.